T. N. Gwaltney v. The Kansas City Southern Railway Company, Appellant.—96 S. W. (2d) 357.

Division Two, August 20, 1936.

*Cyrus Crane, Winston H. Woodson, James F. Walsh. Phil H. Graves* and *Garry D. Long* for appellant.

250

*Frank Nesbitt* and *Gayle M. Pickens* for respondent.

COOLEY, C.—Action for damages for personal injuries and

damage to his automobile claimed by respondent to have been sustained by him because of appellant's negligence. We shall refer to the parties as plaintiff and defendant, respectively, as they were styled below. The petition is in one count. Plaintiff recovered judgment for $8000 on account of personal injuries and $50 for damage to his automobile and defendant appealed. The accident occurred in Oklahoma. The parties concede that the substantive law of Oklahoma governs and both invoke the law and decisions of that state.

The accident occurred about ten o'clock, P. M. April 26, 1932, at a road crossing between Stillwell and Barron Forks, Oklahoma, where a graveled public highway crosses, at grade, defendant's railroad track. The railroad there runs north and south. The highway north of the crossing parallels the railroad for a considerable distance. Approaching the crossing from the north the highway makes a turn approximately fifty feet west of the railroad track and goes thence east across the track. Conditions east of the crossing are not involved. South of the crossing the railroad track is straight for a distance of seven-tenths of a mile, with nothing to obstruct the view. At that distance from the crossing there is a curve in the track. There is a whistling post near the track a quarter of a mile, 1320 feet, south of the crossing. Plaintiff's automobile was struck on the crossing by a northbound train of defendant. The negligence charged is that the crossing was negligently maintained in that there was a shallow depression between the rails of the track, the rails and "guard planks" being two or three inches above the level of the roadway, which caused plaintiff's automobile to become stalled on the track, and negligence of defendant's servants in charge of the train in failing to stop after they discovered his perilous position, under what is called in Oklahoma the "last clear chance" doctrine. Defendant by its answer denied negligence on its part and pleaded contributory negligence on the part of plaintiff. The pleadings present the issue of last clear chance.

Plaintiff's evidence tended to show the following: He was going south toward Stillwell, alone, driving his Chevrolet car. He slowed down in making the above-mentioned turn west of the crossing and approached the crossing, going east, slowly. He testified that when the front wheels of his automobile passed over the west rail and guard plank of the railroad track and dropped into the depression between the rails his engine died and the automobile stopped; that he saw the headlight of defendant's engine, which was then about rounding the curve south of the crossing; that he tried for twenty or thirty seconds to start his car by means of the starter, which failed to work, and he then got out of his car, went behind it and for perhaps five to ten seconds tried to push it forward off the track; that, failing in such effort, and when the train was two or three hundred feet from

him he turned and started to run away from his car; that he had run twenty to thirty feet when defendant's engine struck his automobile, knocking it off the track and against him; that he was thus knocked down, rendered unconscious, and received the injuries of which he complains. He first said he ran in a westerly direction from his car but later said in a northwesterly direction. He testified that the engineer blew the regular crossing whistle south of the whistling post and then, when "right in the neighborhood" of the whistling post began to blow the danger signal,—short, sharp blasts of the whistle,—and continued to sound said danger signal until the engine struck the automobile. A witness for plaintiff, one Coombs, who lived not very far east of the railroad track, southeast of the crossing and northeast of the whistling post, testified: "I heard what we call the crossing whistle blow, and continued to blow from then on down to the crossing." He said the engineer began sounding the danger signal "near this whistling post the best I could tell, in there some place" and continued sounding it until witness heard the crash of the collision. Coombs testified that he heard the brakes applied to the train; that, it seemed to him, it was just about the time of the collision. Plaintiff testified that he heard the train brakes go on just as he turned to run from behind his automobile.

The train was a mixed freight and passenger train, consisting of engine, tender and eight cars. When it stopped the next to last car was on the crossing and the front of the engine was about 490 feet north of the crossing. It was equipped with air brakes in good condition. The track was dry. There was evidence on behalf of plaintiff to the effect that under the existing conditions the train could have been stopped in six to seven hundred feet.

A witness for plaintiff, Grover Ketcher, who heard the danger signals and the collision, ran to the scene, arriving some five minutes after the collision. Coombs arrived very soon thereafter. Plaintiff had been carried onto the train,—by whom is not shown, and there is no evidence as to how far from the railroad track he had been picked up. As above stated, he claimed to have been rendered unconscious and to have had no knowledge of events for some time after being struck by the automobile. According to the testimony of Ketcher and Coombs,—the only witnesses on this point,—the wrecked automobile was found lying four or five feet west of the west rail of the railroad track and just north of the cattle guard on the west side of the track and north line of the highway. The facts relative to this phase of the case will be given in more detail later.

Defendant's engineer testified that he was looking ahead all the time; that he first saw the stalled automobile on the crossing when he was about halfway from the whistling post to the crossing, which would be about 660 feet south of the crossing, and immediately ap-

plied his emergency brakes and began sounding the danger signal. The fireman testified that he saw the automobile when, as he "supposed"—"just guessing at it"—the engine was eight or nine hundred feet from the crossing and that the engineer saw it about the same time and at once applied the emergency brakes. Both engineer and fireman testified that nothing else could have been done to slacken the speed or stop the train. There was other evidence to that effect and no evidence to contrary.

The principal injury complained of by plaintiff was the alleged fracture of his third cervical vertebra, with resultant ill consequences. The doctor who attended him was not called as a witness. Experts called by him testified that X-ray pictures showed such fracture. Several for defendant testified that neither the pictures introduced by plaintiff nor those they had taken showed evidence of a fracture and that they could observe no signs that plaintiff had been injured as he claimed. There was a good deal of testimony pro and con on the subject of plaintiff's alleged injuries, but in the view we take of the case it is needless to detail it. Such further reference to the facts as may be necessary will be made in the course of the opinion.

■ Defendant contends there was no evidence from which negligence on its part could be found. To this we cannot agree. Plaintiff introduced evidence from which it could have been found that there was a depression between the rails which may have caused his automobile, traveling slowly as it was, to stall on the crossing, and thus have contributed to bring about the collision. The Oklahoma statute requires railroads to construct crossings where public highways cross their tracks and "maintain the same unobstructed and in good condition for the use of the public." More directly to the point, however, as concerns defendant's negligence, the testimony of plaintiff and Coombs, if true, tends to show that the danger signals were begun considerably farther south than halfway between the crossing and the whistling post—they said in the neighborhood of the whistling post. The engineer and fireman testified that such signals were begun when the automobile was discovered on the crossing. If, therefore, they were begun at or near the whistling post, the automobile must have been seen by the engineer when he was at or near said post—much more than 660 feet south of the crossing. Also, plaintiff and Coombs testified to hearing the brakes applied—plaintiff saying it was when he turned to run, when, as he said, the train was two or three hundred feet from the crossing, and Coombs that it seemed to him it was "just about the time of the crash" (of the collision). The weight and value of that testimony was for the jury. ■ Defendant contends that the testimony of plaintiff's witness, Reeder, to the effect that the train should have been stopped in six or seven hundred feet, is of no probative value, because the hypothetical ques-

tion in response to which he gave that testimony did not include the element of stopping with safety to the passengers and crew of the train, as it should have done. Defendant did not object to the question on that ground nor include that suggestion in the objection it made, for which reason it is in no position to complain, on that ground, of the admission of the testimony. And we think it cannot be said, under the circumstances, that the testimony has no probative value. But if it could be so said we think there is still sufficient evidence from which the jury could find that the engineer did not apply his brakes as soon as he might have done after discovering the automobile on the track and that had he done so he might have averted the collision.

It is conceded that under the Oklahoma law the "last clear chance" doctrine does not apply until the engineer actually saw the plaintiff's perilous position. But the testimony of the engineer that he did not see the automobile until he was halfway from the whistling post to the crossing and that he immediately applied his brakes is not conclusive against plaintiff if there are facts and circumstances shown from which the jury could reasonably believe and find that he did see and could have applied the brakes sooner than he says he did. In St. Louis-S. F. Ry. Co. v. Bryan, 113 Okla. 39, 237 Pac. 613, the court, after stating what the engineer had testified to and certain facts and circumstances shown in evidence which tended to contradict the engineer's testimony, said, 113 Okla. l. c. 41:

"These circumstances may be considered inconsistent with the direct testimony of the engineer, and where the physical facts and the circumstances surrounding the occurrence tend to contradict the positive testimony, then it becomes a question of fact for the jury, and the jury may accept the evidence of the physical facts and reject the positive testimony."

It is further contended by defendant that even if it was primarily guilty of negligence the plaintiff, on the showing made by his own evidence, had the last clear chance to avoid injury and was conclusively guilty of negligence which bars recovery. So far as concerns the personal injuries we think this contention must be sustained.

The Oklahoma last clear chance doctrine is thus stated in Atchison, T. & S. F. Ry. Co. v. Bratcher, 99 Okla. 74, 77, 225 Pac. 941:

"In this and other jurisdictions the rigorous application of the rule against recovery where contributory negligence is shown has been ameliorated in proper cases by the adoption and application of what is euphoniously termed the "humanitarian' or 'last clear chance' doctrine. This is but a variation of the doctrine of comparative negligence, which has long since been expressly repudiated in this State. . . . Therefore, before the doctrine of last clear chance can be applied in any case, it must appear, either that the primary

negligence of the defendant continued after the contributory negligence of plaintiff ceased, or that some new primary negligence of the defendant intervened between the cessation of the contributory negligence and the infliction of the injury. If the primary negligence and the contributory negligence are coexistent and contemporaneous, the doctrine of last clear chance has no application. It cannot then be said that the primary negligence is the proximate cause of the injury. (Citing authorities.) As is said in 1 White on Personal Injury, page 526:

" 'This rule does not exempt the injured person from the consequences of his own contemporaneous negligence, which is an immediate, direct and proximate cause of the injury. When the carelessness of both parties is contemporaneous and the injury results from the mutual want of care on their part, then no recovery can be had under the humanitarian doctrine.' "

In Missouri, O. & G. Ry. Co. v. Lee, 73 Okla. 165, 171, 175 Pac. 367, the court says:

"In the case of O'Brien v. McGlinchy, 68 Me. 552, is a clear and succinct statement of the law on this subject, to-wit:

" 'But in cases falling within the foregoing description, where the negligent acts of the parties are distinct and independent of each other, the act of the plaintiff preceding that of the defendant, it is considered that the plaintiff's conduct does not contribute to produce the injury, if, notwithstanding his negligence, the injury could have been avoided by the use of ordinary care at the time by the defendant. This rule applies usually in cases where the plaintiff or his property is in some . . . danger from a threatened contact with some agency under the control of the defendant when the *plaintiff cannot and the defendant can* prevent an injury . . . But this principle would not govern where both parties are contemporaneously and actively in fault, and by their mutual carelessness an injury ensues to one or both of them.' " (Italics ours.)

Plaintiff argues that contemporaneous or concurrent negligence on the part of the injured person does not bar recovery under the Oklahoma law, citing, among other cases, St. Louis-S. F. Ry. Co. v. Bryan, supra, wherein it is said, 113 Okla. 1. c. 41:

"The last clear chance doctrine applicable here contemplates a danger which the engineer, having knowledge thereof, may avoid by due care on his part. To hold that if he, having the last clear chance to avoid the injury by the exercise of due care, is excused if the injured party's negligence continues or is concurrent, is to deny the application of the last clear chance doctrine. It, in effect, would be holding that the rule of contributory negligence would apply and be a defense under such circumstances. The failure of the engineer to perform his duty, when he has knowledge of the person's peril and

has the opportunity to prevent the injury by the exercise of due care, raises liability. In our judgment, the correct rule is that defendants cannot rely upon contributory negligence of the injured person as a protection where the injury was more immediately caused by the want of due care on defendants' part to avoid the injury after discovering the peril of the injured party."

Other Oklahoma cases are cited in which it is said, as in the Bryan case, that the defendant cannot rely on the contributory negligence of the injured person as a protection where the injury was more immediately caused by the want of due care on defendant's part to avoid the injury after discovering the peril of the injured party.

We deem it unnecessary to decide whether or not there is a substantial difference in legal effect in the statements of the law as above quoted. As we understand the Oklahoma decisions, under all of them if the injured person had the last clear chance to avoid injury and negligently failed to do so he cannot recover on the last clear chance theory. Varying facts in different cases must of course be considered in determining whether or not the rule applies, as is shown in the numerous cases cited. The determination of the question in the case before us requires a further statement of the facts.

At and near the crossing in question the railroad track and the roadway surface of the highway are upon embankments several feet high. The situation, including the crossing, the cattle guard, a short section of the railroad track north of the crossing and the highway for some distance west of the crossing, is clearly portrayed by a photograph introduced in evidence by plaintiff and conceded to be a good representation of the *locus in quo*. The north side of the roadway embankment is supported by a stone wall, appearing in the photograph to be about perpendicular and higher than the fence posts on the north right of way line of the highway, and which extends practically to the west side of the railroad embankment. Plaintiff testified that the roadway west of the crossing was about fifty feet wide. It is clear that by roadway he meant the built up portion of the highway, that is the embankment on which the road approaches the railroad track, and we shall so use the term roadway. The roadway as it approaches the crossing is nearly level, perhaps a little downgrade toward the east.

The cattle guard north of the crossing on the west side of the railroad track appears, from a fence extending westward therefrom, to be on the north right of way line of the highway. Plaintiff's witness, Ketcher, testified that the cattle guard was ten or twelve feet north of the north edge of the highway "as it crosses the railroad." It is clear he meant the built up portion of the highway, or what we are calling the roadway. The cattle guard is the ordinary cattle guard seen on many railroads at highway crossings. Between the

rails and for a short distance outside them there are wooden or metal strips laid parallel with the rails,—crosswise of the ties. There are three such strips west of the west rail. From about the west side of the westernmost of those three strips there extends upward and westward the structure which the witnesses referred to as the cattle guard, viz., an A-shaped wooden structure, with crosspieces, with its base resting on a support at about the outside of the westernmost strip above mentioned and sloping upward and westward at an angle of, apparently, about forty-five degrees, its apex resting upon a post and being about five or five and a half feet above the level of the track. Its base appears to be not more than two or three feet from the west rail of the track. We shall hereafter refer to this A-shaped structure as the cattle guard, it being what the witnesses meant when they spoke of the cattle guard. Plaintiff's evidence shows that the north side of said cattle guard was broken or torn off by the automobile when it was struck and knocked from the track by the engine. As we have stated, the wrecked car came to rest just north, and within two or three feet, of this cattle guard and four or five feet west of the west rail of the track. Plaintiff's car was "just a common Chevvie," he "supposed" about eight feet long—he had never measured one—and he said that when it stalled about one-third of its length, possibly a little more, had passed over the west rail. He said that the automobile projected four or five feet west of the west rail.

Plaintiff, as we have said, first testified that he ran in a westerly direction from his car; later indicated that he ran in a somewhat northwesterly direction. He does not indicate that he ran *off the roadway.* It is in effect conceded in his brief that he did not do so and it is impossible to assume under the evidence that he might have done so. To have done that would have taken him over the abrupt drop at the north edge of the roadway embankment. There is no contention that he left the roadway. He said at one time that after he had run the twenty or thirty feet from his automobile it put him "possibly fifteen feet, ten or fifteen feet, I don't know exactly," *west* of the automobile. Later, these questions were asked and answers given: "Q. How many feet were you west of the west rail at the time you started to run? A. Well, my best judgment, 10 or 12 feet, something like that. Q. Ten feet? A. Approximately 15. I don't know."

Now, notwithstanding plaintiff's testimony that he left the car and started to run away when the train was two or three hundred feet from him, it is obvious from the physical facts established by the undisputed testimony of his own witnesses that he remained behind his car trying to push it off the truck until it was struck or at least practically until that instant. In no other way could he have been struck by the automobile. Testimony that is in absolute conflict

with the physical facts cannot be allowed probative value. Here the physical facts showing the course the automobile took when struck are established by the uncontradicted testimony of plaintiff's own witnesses. It was knocked almost due northward, only very slightly westward, as conclusively shown by the broken cattle guard and the fact that it came to rest right by the cattle guard and only four or five feet from the west rail of the track. It barely cleared the track, Plaintiff's testimony puts him behind the automobile after he got out and tried to push it. There is no evidence tending to show that he was at any time north of it. If, as he said at one time, he was fifteen— or even ten—feet *west of the automobile* when it was struck by the engine it could not have struck him. And if, as he said at another time, he was ten or twelve feet from the west rail of the track when he started to run and ran twenty or thirty feet, west or northwest, before the collision, the automobile could not have struck him. It appears to us clear that on no possible theory, consistent with the established physical facts, could plaintiff have been struck by the automobile if, as he claimed throughout, he had run twenty or thirty feet, either west or northwest, from the rear end of the automobile, or any substantial part of that distance, before the collision. In his testimony he was of course only estimating distances. But, as said above, it is clear from the physical facts shown that he must have remained behind and in immediate proximity to his automobile until practically the instant of the collision.

Plaintiff estimated the speed of the train at "thirty to thirty-five, maybe forty miles an hour." Defendant's engineer said he was going about fifty miles an hour as he passed the whistling post. Regardless of the speed, plaintiff knew all the time of the approach of the train and heard the sounding of the whistle—first the crossing signal and then the danger signal, continuing to the time of the collision. He knew that he might be injured if he remained in close proximity to his car until it was struck by the oncoming train. He could easily have removed himself to a place of safety in time to have avoided injury. We cannot escape the conclusion that, under the facts and circumstances shown by his own evidence, plaintiff must be held to have had the last clear chance to avoid personal injury and to have been guilty of negligence which bars recovery therefor.

Plaintiff in his brief argues that, though he was not oblivious of his peril he was in a position of peril from which he could not extricate himself "and is entitled to the benefit of the rules of 'last clear chance' and 'imminent peril.'" He cites, with a number of other cases, McGuire v. C. & A. Railroad Co. (Mo. App.), 228 S. W. 541. He contends that said McGuire case is particularly in point. In that case the plaintiff's automobile, containing himself, his wife and child,

stalled on the defendant's railroad track. He then discovered an approaching train 590 feet away. The opinion says:

"They, of course, were alarmed. He could not get the auto to start, and his wife stood up, and he then tried to open the door; his wife was in the act of getting out, perhaps (it is not clear) was on the ground, and he yet in the auto, when the train came upon them, inflicting the injury."

It is not shown how long the plaintiff tried to start his car. The defendant could have stopped the train in time, after discovering the plaintiff's peril, to have averted the injury. Conceding that the plaintiff was negligent in getting into his perilous position the court held that our "humanitarian doctrine" applied. That case is clearly distinguishable from the case before us. Here plaintiff had got out of his car, was in no danger except by remaining behind it trying to push it off the track and had ample time to leave it and get to a place of safety. This is not a case of a person being unable to extricate himself from a position of peril. Neither do we think that plaintiff's negligence in voluntarily remaining in a position of known danger can be excused on the ground that he was endeavoring to save his automobile. We are not cited to any Oklahoma decision deciding this proposition but in this State it is settled that a person is not excused from the consequences of contributory negligence in voluntarily exposing himself to a known peril for the purpose of saving property.

In McManamee v. Mo. Pac. Ry. Co., 135 Mo. 440, 37 S. W. 119, the plaintiff's husband had left his horse and wagon near the defendant's railroad track. The horse started to move away and McManamee got in front of the horse to stop him and was struck and killed by an approaching train. There was evidence of negligence on the part of the defendant. The court approved the following instruction:

"While it may have been the duty of defendant's servant to make all reasonable efforts to stop the train and avoid the collision, yet the like duty devolved upon the deceased, and if, after he saw the train coming, or might, by looking and listening, have seen it coming, he could have gotten out of its way, or kept out of its way, but did not, then the plaintiff cannot recover; and, even should the jury believe that the deceased's horse and wagon were exposed to a collision with defendant's train, this would not excuse or justify him precipitating himself in front of the train, and if you find he did so in order to save his said horse and buggy, then your verdict must be for the defendant."

In Johnson, Admx., v. Terminal Railroad Assn. (en banc), 320 Mo. 884, 8 S. W. (2d) 891, the plaintiff's decedent, Nexsen, had been killed in attempting to "chock" and stop a freight car to prevent it from striking other cars. There was no threat to life or limb. Re-

covery was denied because of contributory negligence. The court said, 320 Mo. 1. c. 888, 8 S. W. (2d) 1. c. 923 (2, 3) : "Nexsen's act in voluntarily exposing himself to danger by going in front of the rapidly moving freight car cannot be justified on the 'imminent peril' doctrine. In our decisions that doctrine only applies when it appears that the act was necessary to save life or limb." (Citing cases.)

It may be that where the question of contributory negligence is involved the fact that the injured person was acting in an effort to save his property may be given consideration in determining whether or not he was acting as a reasonably prudent person would have acted under the circumstances, in other words whether or not he was negligent (Hill v. East St. Louis Cotton Oil Co., 202 Mo. App. 478, 214 S. W. 419), but considering that along with the other facts and circumstances in the instant case the fact that plaintiff was trying to save his property cannot, in our opinion, relieve plaintiff's conduct from its negligent character.

Appellant assigns error in the giving and refusing of instructions and in certain rulings of the court relating to the admission and exclusion of evidence and alleged prejudicial argument to the jury by plaintiff's counsel. We do not think the rulings complained of materially affected plaintiff's recovery for damage to his automobile and in view of our holding that plaintiff, on the record before us, is not entitled to recover for personal injuries these assignments need not be discussed. We think plaintiff made a submissible case as to damage to his automobile.

The item of $8000 for personal injuries, as returned in the verdict and carried into the judgment, should be stricken out of the latter. The judgment is accordingly reversed and the cause is remanded to the circuit court with directions to enter judgment for plaintiff, as of the date of the original judgment, for fifty dollars, the amount assessed by the jury for damage to plaintiff's automobile, same to bear interest from said date. [See State ex rel. Gott v. Fidelity & Deposit Co., 317 Mo. 1078, 1095, 298 S. W. 83; Block v. U. S. Fid. & Guar. Co., 316 Mo. 278, 308, 290 S. W. 429, 442.] *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by Cooley, C., is adopted as the opinion of the court. All the judges concur.