MARY CARPENTER v. JAMES M. KURN and JOHN G. LONSDALE, Trustees of ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, Appellants.—136 S. W. (2d) 997.

Division Two, February 21, 1940.

878

*J. W. Jamison, Gene Frost* and *Mann, Mann & Miller* for appellants.

*Harry G. Waltner, Jr., Sizer & Myres* and *Franklin E. Reagan* for respondent.

COOLEY, C.—This action was brought by respondent as the widow of Reuben Carpenter, deceased, to recover damages for the alleged wrongful death of the deceased, which occurred on the 25th day of May, 1937, near Henryetta, Oklahoma, the plaintiff alleging that she brought the action for the benefit of herself and the deceased's four minor children. There was a verdict and judgment for plaintiff for $18,000. Defendants appealed. Before stating the facts or proceeding to consideration of the case on the merits we will dispose of a motion to dismiss the appeal.

Appellants' abstract of record was filed here August 22, 1939. On July 11, 1939, respondent filed a motion to dismiss the appeal and a "supplemental transcript," certified by the clerk of the circuit court. The ground of the motion is that no sufficient affidavit—in fact *no* affidavit—for appeal was filed in the circuit court, wherefore this court acquired no jurisdiction. Appellants' abstract does not set out the affidavit. In the "short form transcript" certified here by the circuit clerk the circuit court's order granting the appeal is set out, reciting in substance that the defendants filed their affidavit praying an appeal and "same being seen, heard and fully understood is by the court sustained and appeal granted to the Supreme Court of Missouri as prayed for." The supplemental transcript above mentioned shows entries appearing on the court's docket relative to the case. After setting out entries showing various steps in the trial it shows "Affidavit for appeal filed (14) Appeal granted to Supreme Court of Missouri (14)." Included in said supplemental transcript is a copy, certified by the clerk, of the affidavit for appeal. Omitting caption, it reads:

"On this day personally appeared before me, the undersigned Circuit Clerk, within and for Barry County, Missouri, GENE FROST, who, being first duly sworn upon his oath, says that he is attorney and agent for the defendants in the above entitled cause and that, as such, he is authorized to and does make this affidavit in their behalf.

·"Affiant further states that the appeal prayed for by the defendants is not made for vexation or delay, but because affiant believes defendants are aggrieved by the judgment or decision of the Court.

"Gene Frost

"Subscribed and sworn to before me, this ——— day of November, 1937.

"Circuit Clerk.

"FILED
"DEC. 1, 1937.
"OTIS COX,
"Circuit Clerk."

On September 19, 1939, appellants, in order to show that the affidavit for appeal was in fact sworn to, filed in this court, two affidavits. In order to give a clear understanding of the allegations thereof, we set them out, except the jurats, which· certify as to both that they were subscribed and sworn to on July 17, 1939. They read:

"State of Missouri, County of Barry, ss.

"Gene Frost, of lawful age, being first duly sworn upon his oath, states that he is an attorney at law, residing at Cassville, Missouri, and was one of the attorneys of record for the defendants in the case of Mary Carpenter, plaintiff, versus J. M. Kurn and John G. Lonsdale, trustees of St. Louis-San Francisco Railway Company, which was tried in the Circuit Court of Barry County, Missouri, on November 19th and 20th, 1937, and as attorney and agent for said defendants executed the affidavit for appeal filed in said cause, following the overruling of the motion for new trial on December 1st, 1937; that the motion for new trial in said case was orally argued before the court on Monday, November 29th, 1937, during the regular November Term of said court; that following the arguments of counsel the court took the motion under advisement and announced that it would pass upon said motion before the adjournment of the term, but was uncertain as to when the term would adjourn. On that day, while in Cassville, the form of affidavit for appeal was prepared by Frank C. Mann, one of the attorneys for defendants and left with affiant to be executed and filed in the event the court should overrule said motion; that this explains the fact that at the close of said affidavit and in the jurat the date is shown as 'This ——— day of November, 1937.'

"Affiant further states that the motion for new trial in said cause was, by the court, overruled on December 1st, 1937; that on that date and immediately following the overruling of said motion for new trial, this affiant, in the office of Otis Cox, the Circuit Clerk, and in the presence of the said Otis Cox, signed said affidavit for appeal and handed it either to Mr. Cox, the clerk, or to Eileen Thomas Sanders, the deputy circuit clerk, both of whom were standing at the clerk's

desk, and at the time of so doing stated to Mr. Otis Cox, the clerk, that he made oath to the facts set forth in said affidavit, and asked the clerk to affix his jurat thereto and file the same; and that said clerk took said oath and stated he would affix his jurat thereto; that affiant then went into the court room and had the court enter upon its docket the filing of said affidavit for appeal, following which the court made an entry upon its docket granting defendants an appeal to the Supreme Court of Missouri.

''Affiant further states that he relied upon the said Otis Cox, clerk of said court, to affix his signature and jurat to said affidavit for appeal, and that his attention was not called to said affidavit for appeal thereafter and until in December, 1938, when, upon examining said affidavit for appeal so signed by him and filed by the clerk on December 1st, 1937, he found that the clerk had not affixed his signature or jurat; that the said Otis Cox had died prior to that time, on or about the 18th day of May, 1938.

''Affiant further states that when the Circuit Court of Barry County, Missouri, is in session it has been the practice for many years, and was on December 1, 1937, the practice of the clerk of said court to keep all of the files in cases then upon the docket in a filing cabinet upon his desk in the court room, and also there to keep the seal of said clerk and the filing stamp with which papers filed in said court are marked filed; that he is reasonably certain that on that day and at the time he handed the affidavit for appeal to the said Otis Cox in the latter's office adjoining the court room that the clerk's seal was then in the court room and not in the office of the said Otis Cox, and it is the opinion of affiant that the said Otis Cox, upon receiving said affidavit from this affiant took the same into the court room, where he there stamped it filed but failed, through inadvertence and oversight, to sign or affix his jurat to said affidavit.

''Gene Frost.''

''State of Missouri, County of Barry, ss.

''Eileen Thomas Sanders, of lawful age, being first duly sworn upon her oath, states that on, and for some time prior to, December 1st, 1937, and thereafter until December 31st, 1938, she was a deputy circuit clerk in the office of the circuit clerk of Barry County, Missouri; that Otis Cox was, on December 1st, 1937, and for some time prior thereto and until his death on or about the 18th day of May, 1938, the clerk of the Circuit Court of Barry County, Missouri; that during the time said Otis Cox was circuit clerk, it was his practice personally to wait upon the court and be in the court room most of the time during the sessions of said court; that affiant remained in the circuit clerk's office adjacent to the court room; that while the Circuit Court was in session it was the custom and practice of the circuit clerk to keep at his desk in the court room all of the court files in cases then upon the docket, his seal as circuit clerk, and

the stamp with which he stamped as filed all papers filed in said court; that neither the seal nor the file stamp were generally kept in the clerk's office while court was in session; that she does not now remember any of the circumstances in connection with the filing of an affidavit for appeal in the case of Mary Carpenter, plaintiff, versus J. M. Kurn and John G. Lonsdale, trustees of St. Louis-San Francisco Railway Company, defendants, or of the execution of said affidavit for appeal by Gene Frost, one of the attorneys for defendants in said case, but that frequently attorneys and others would execute affidavits to be sworn to by the circuit clerk, or one of his deputies, in the office of the circuit clerk, and when that was done, while said Circuit Court was in session, after swearing the affiant to the affidavit, it was the practice of the clerk, or of the deputy before whom the affidavit was made, to take the same to the court room and there to complete the jurat and affix the seal, and that she has seen the said Otis Cox do this on numerous occasions.

"Eileen Thomas Sanders."

It seems to be conceded that in order to confer jurisdiction upon the appellate court there must be filed in the trial court an affidavit for appeal, as provided by statute, substantially complying as to its averments with the requirements of the statute, and that the order of the circuit court granting an appeal does not confer such jurisdiction in the absence of a sufficient affidavit. [See Cassidy v. City of St. Joseph, 247 Mo. 197, 203, 152 S. W. 306.] Respondent cites numerous Missouri cases so holding but they need not be referred to herein because appellants do not dispute those propositions, but contend those cases do not apply—a contention with which we agree. They are cases in which the averments of the affidavit did not substantially comply with the requirements of the statute or cases in which the record showed only an affidavit or purported affidavit without a jurat and there was no showing that the affidavit had in fact been sworn to. If in the instant case we had for consideration only the affidavit as certified to us by the circuit clerk in the supplemental transcript we would have to hold it insufficient. But it has been held several times that where an affidavit for appeal does not show the jurat of the officer taking it, it may nevertheless be shown that it was in fact sworn to.

Section 1099, Revised Statutes 1929 (Mo. Stat. Ann., p. 1388), enumerates many imperfections for which judgments shall not be reversed or affected. Section 1100, Revised Statutes 1929 (Mo. Stat. Ann., p. 1395), provides that: "The omissions, imperfections, defects and variances in the preceding section enumerated, and all others of a like nature, not being against the right and justice of the matter of the suit, and not altering the issues between the parties on the trial, shall be supplied and amended by the court where the judgment shall be given, or by the court into which such judgment shall be removed by writ of error or by appeal."

The above quoted section was treated as applying to the omission of the jurat on an affidavit for appeal in Cooley v. Kansas City, P. & G. Railroad Co., 149 Mo. 487, 51 S. W. 101. In that case there had been a former trial and an appeal to the Kansas City Court of Appeals, which court reversed the judgment and remanded the cause. After the remand the defendant filed, in the circuit court, a motion to dismiss the cause on the ground that no affidavit for appeal had been filed and the appellate court therefore had been without jurisdiction to render the judgment of reversal. The circuit court, after hearing evidence as to whether or not the plaintiff's attorney, by whom the affidavit was signed, made oath thereto, overruled the motion to dismiss and permitted the clerk to attach the proper affidavit. This court, 149 Mo. l. c. 491, 51 S. W. 102, quoted Section 2114, Revised Statutes 1889, now Section 1100, supra, and said:

"No reason is therefore seen why the omitted jurat could not have been supplied by leave of either this or the circuit court, even after the judgment of reversal was given by the court."

The "preceding section" referred to in Section 2114, Revised Statutes 1889, is now Section 1099, Revised Statutes 1929 (Mo. Stat. Ann., p. 1388).

In Clark v. St. Joseph Term. Railroad Co., 242 Mo. 570, 590-593, 148 S. W. 472, a judgment was rendered and appeal taken in March, 1908. In 1911 it was discovered that the name of the officer before whom the affidavit was made was missing. That officer was then dead. The circuit court heard evidence, found that the affidavit had been sworn to and caused *nunc pro tunc* entries to be made so showing. The respondent in this court challenged the court's right thus to amend its records and moved to dismiss the appeal, which motion was denied. The court cited and quoted from the Cooley case, including quotation of Section 2114, Revised Statutes 1889, emphasizing the statement that "no reason is therefore seen why the omitted jurat could not have been supplied by leave of either this or the circuit court." On this point see also State ex rel. Title Guaranty & Trust Co. v. Broaddus, 210 Mo. 1, 14, 108 S. W. 544, citing said statute and the Cooley case.

In Davidson v. LaClede Land & Improvement Co., 253 Mo. 223, 228, 161 S. W. 686, the jurat was not signed. A motion to dismiss the appeal was filed here, based upon such omission. It was overruled. The court said that,

"Depositions have been taken and are on file which disclose that the circuit clerk personally entered the minutes of the filing of the affidavit for appeal, the allowance of the appeal, etc., but he testifies he does not know why the jurat was unsigned. He has no direct recollection of the happenings at the time, but testifies the orders were taken in this and several other cases during the hurry of the

closing hours of the term. By deposition appellant's attorney testifies positively he signed and was sworn to the affidavit in this case and in another at the same time and filed both affidavits with the clerk.''

The court further said that, it sufficiently appearing that the affidavit was in fact sworn to, it would be so treated, ''there being no necessity of going through the now 'bare and meaningless formality' of literally inserting the clerk's name above his official designation as it now appears in the affidavit.''

It is not definitely stated in the Davidson case that the depositions were taken by leave of this court but they must have been, since the circuit court, having granted an appeal, no longer had control of the case and it was pending in this court.

It is thus evident that the lack of a jurat appearing on an affidavit for appeal may be supplied after the case reaches this court upon proof that it was in fact sworn to. We find no direct ruling of this court as to how the proof must be made. In some of the cases *nunc pro tunc* entries were made in the circuit court after hearing of evidence by that court. In the Davidson case it was made by deposition. In Viertel v. Viertel, 99 Mo. App. 710, 75 S. W. 187, it was made by affidavits filed, as here, in the appellate court. In that case the court accepted the affidavits, said they stood uncontradicted and overruled the motion to dismiss the appeal. In the case before us the affidavits stand uncontradicted. Mr. Frost swears positively that he made oath to the affidavit for appeal. In the Davidson case the court said, speaking of the attorney's deposition: ''There is nothing, except the absence of the clerk's signature, tending to overthrow this testimony and the tendency of the record entries to corroborate it.'' That, we think, may as well be said in this case. We have no doubt that the affidavit was in fact sworn to and that the clerk's failure to attach his jurat was a mere oversight or inadvertence on his part. The motion to dismiss the appeal is overruled.

### Of the case on the merits:

Defendants urge that the trial court should have sustained their demurrer to the evidence and directed a verdict for them, for which reason a somewhat detailed statement of the facts is required.

Plaintiff's evidence tended to show the following:

The accident in question occurred on defendants' railroad track about a mile south of Henryetta, at about 4:30 P. M., on a clear day. The track was dry. The railroad there runs in a generally north and south direction. About 2100 feet south of the place of the accident a much traveled public highway crossed the railroad. This crossing is referred to as the Dustin crossing. About 1500 feet north of that crossing there was a private crossing known as the Hobbs

crossing. Plaintiff's husband, whom we shall refer to as the deceased, was struck and killed by a northbound passenger train, consisting of engine, equipped with air brakes in good condition, and two coaches, running sixty miles per hour, at a point variously estimated to be four or four and a half poles (Telegraph poles, the poles being 150 feet apart), or approximately 600 to 700 feet north of the Hobbs crossing. Some 200 to 300 feet north of the place of accident there was a trestle bridge about 200 feet long in the railroad track. From a point 200 feet or so south of the Dustin crossing north to and beyond the trestle the track is straight, with nothing to obstruct the view of the engineer of a train approaching the place of accident from the south. The track is a little downgrade toward the north.

As the train approached deceased he was sitting on the east or right hand rail of the track, with his feet between the rails, his arms resting on his knees and his head bent over, resting on his arms. He did not move before being struck and gave no sign of being aware of the approach of the train. The engine was whistling continuously or almost continuously from south of the Dustin crossing to the point of collision. There was considerable evidence of use of the railroad track by pedestrians, to which we will refer later if necessary.

Plaintiff called defendants' fireman, Mr. Cobbs, as her witness. He testified that as the train approached the Dustin crossing (running on its scheduled time) he was watching that crossing and supposed the engineer was; that the engine whistled for that crossing; that when the engine passed that crossing he looked ahead and continued looking ahead; that after they passed the crossing he saw an object on the track but could not tell what it was, whether animate or inanimate; that when he saw the object he glanced at the engineer, who was looking ahead; that "just guessing," since he was not watching the poles but looking ahead, but according to his best judgment, they ran four or five or six poles after he first saw the object before the brakes were applied; that, while, as stated, he was not watching the poles, he judged the engine was six or seven poles from the object when he discovered it to be a man and just about that time the emergency brakes went on; that the engineer had the emergency brakes on before he (Cobbs) had time to say anything to him and kept them on until the trian stopped; that after he discovered the object to be a man nothing could have been done other than what the engineer did to stop the train more quickly—"We did stop as soon as it could be humanly possible stopped;" That the engineer did not reverse his engine but that reversing would not have resulted in as quick a stop as the method used.

John Ruskoski, for plaintiff, testified that he had had twenty-three years experience as fireman, conductor and engineer—fourteen years as engineer; that a train such as that here involved and under the

conditions that existed could be stopped easily in 800 feet and by reversing and applying sand in 750 feet. He said, "I wouldn't reverse the air unless I got close enough to know I was going to strike the object. I have done it time and again." He explained why he thought that, with a short train, a quicker stop could be made by reversing, as did Cobbs why he thought the contrary. We omit the explanations as they were matters for the consideration of the jury.

The engineer, called by defendants, testified that he whistled for and watched the Dustin crossing until he passed it; that after passing that crossing he was looking ahead and saw some object on the track and began sounding the alarm whistle—short blasts—thinking if the object was alive it would move; that the whistling was continued until the collision; that when he first saw the object he could not tell what it was, whether animate or inanimate; that, while he was not watching the poles, his judgment was that he was six or eight poles from the object when he discovered it was· a man and he immediately applied his emergency brakes, also using sand, and kept the brakes on; that it takes a second or two for the brake shoes to come up to the wheels and set them; that the train could not possibly have been stopped more quickly than it was after he discovered the object on the track was a man; that it could not have been stopped as quickly by reversing.

There was evidence from both sides that in the cab of a fast moving train the engineer and fireman, looking ahead through windows, as were the engineer and fireman in this case, cannot distinguish objects ahead as readily and clearly as if the engine were standing still, owing to the "vibration" and swaying or "lateral" motion of the engine. Also, the roadbed was covered with white or light colored chat and the trestle was of dark color, which the engineer said made a dark background beyond the object on the track, making it more difficult for him to distinguish what it was.

Defendants introduced evidence tending to show that deceased may have been intoxicated. A witness testified to seeing him in Henryetta about an hour before the fatal accident and another to seeing him there about thirty minutes earlier. Both said that when they respectively saw him he was drunk. Evidently, however, he was not intoxicated to the point of helplessness or insensibility because, while it is not shown how he got from Henryetta to the place of the accident, it is a reasonable assumption that he must have walked on the track, negotiating the trestle, which presented a surface of only· rails and ties, in the journey; and he was sitting on the rail, not ·lying prone, when struck.

Some other issues besides that of the demurrer are presented, the facts relative to which will be given later.

The accident having occurred in Oklahoma it is conceded that the Oklahoma law governs. Plaintiff invokes the Oklahoma "last chance"

doctrine. Her principal instruction, submitting the case, directed a verdict for her if the jury found that defendants' employees in charge of the train discovered deceased sitting on the track in imminent peril and oblivious of the approach of the train and thereafter, by the exercise of ordinary care, could have stopped the train in time to have saved him. Defendants contend there was no negligence shown on the part of said employees and further, that if there was, plaintiff cannot recover because deceased's contributory negligence continued up to the moment of the collision and concurred with that of said employees, if any, and that he had the last clear chance to save himself by stepping off the track or simply throwing himself backward after it was too late for those in charge of the train to avert the collision.

The case appears to have been tried below on the theory that deceased was a trespasser and that those in charge of the train owed him no duty to stop or take measures to stop until they actually discovered him on the track in a position of peril and discovered that the object they saw was a human being. We believe that theory applicable to the facts of this case. In Atchison, T. & S. F. Ry. Co. v. Phillips (Okla.); 12 Pac. (2d) 908, a child was struck and killed by a train at or near a "false bridge" on the railroad track. The child had evidently sat down on one of the ties, outside the rails. The evidence indicated that the child discovered the train and was struck while running down the track to escape. There was a foot path near, which ran diagonally across the track, and the child was struck at or near that path. In discussing the case the court said, l. c. 910:

"The fact that the child was struck at or near a path running diagonally across the track is immaterial herein, for the reason that there is nothing in the record to show that the child was struck by the train while it was traveling the path described by its father. For the reason stated, the decisions relied upon by the plaintiffs, relating to injuries occurring while a well-worn and beaten path was being used by a pedestrian, have no application herein.

"Those decisions are not applicable where the injury occurred while the pedestrian was not using the path but had left it and had gone to a point on the track, as in this case, at least forty feet away from the path, *and they are not applicable where a pedestrian sits down upon the track.* While the existence of a path may be an invitation to use the path as a passageway, it is not an invitation to use the track as a place on which to sit. When the child went to the 'false bridge' and sat down on one of the ties outside of the rails, it became and after that time was a trespasser. [Midland Valley Ry. Co. v. Kellog, 106 Okla. 237, 233 Pac. 716; Bevins' Admr. v. Chesapeake & O. Ry. Co., 190 Ky. 501, 227 S. W. 794; Davis v. Crawford's Admx., 203 Ky. 71, 261 S. W. 835; Lee's Admr. v. Hines, 202 Ky. 240, 259 S. W. 338.]".

In Lee's Admr. v. Hines, supra, a child was sitting on the end of a tie just outside the rail and was struck and killed by a train. The evidence showed such use of the track as a walkway as to require the operators of the train to keep a lookout for pedestrians but the court held that as to persons sitting or lying on the track the operators of the train did not owe such duty, under Kentucky decisions and "the weight of authority elsewhere;" that it makes no difference whether the place in question is one where, by reason of user, as a walkway, such use is expected and licensed by the railway company, or a place where the use of the track as a walkway is neither licensed nor the presence of persons so using it is to be anticipated; that "In either case they (persons sitting or lying on the track) are trespassers to whom the trainmen owe no duty to maintain a lookout for their presence on the track, or give signals of the movements of the train, but are only bound to use reasonable, or ordinary, care to prevent injury to them after their peril is discovered." [202 Ky. 1. c. 250.]

No Oklahoma decision is cited in support of the proposition that the operators of the train owed deceased no duty to stop or take steps to stop until they discovered that the object they saw on the track was a human being. As we said above it seems to be so conceded. And if it is not so conceded, see, so holding: Voorhees v. Chicago, R. I. & P. Ry. Co. (Mo. App.), 7 S. W. (2d) 740; same case, second appeal, 325 Mo. 835, 30 S. W. (2d) 22, 70 A. L. R. 1106; Louisville, H. & St. L. Ry. Co. v. Hathaway's Admrx. (Ky.), 2 L. R. A. (N. S.) 498.

The question as to defendants' negligence, therefore, is whether or not the persons operating the train could have stopped it in the exercise of ordinary care after they discovered deceased to be a human being in a position of imminent peril and before striking him. Such discovery was made, according to the judgment of Cobbs, the fireman, when the engine was six or seven poles from deceased. The engineer estimated the distance to be six to eight poles. Six poles would be 900 feet, seven poles 1050 feet and eight poles 1200 feet. Plaintiff's witness, Ruskoski, testified that the train could easily have been stopped in 800 feet and by reversing could have been stopped in 750 feet. He was experienced as an engineer and was not impeached. 750 or 800 feet seems to us a short distance in which to stop a train, such as that in question, going sixty miles per hour, but it is not for us to pass on the probative value of that testimony. The engineer and fireman, when they thus discovered deceased to be a man, could not reasonably have presumed or expected that he would get off the track in time to save himself. He had paid no attention to the previous and then continuing blasts of the whistle and gave no sign of hearing or having heard them. It must have been apparent to the engineer and fireman that deceased was oblivious of the approach of the train. While the question seems to us close we believe a submissible case was made so far as concerns the question of defendants' negligence.

As to deceased's contributory or concurrent negligence defendants rely chiefly on our decision in Gwaltney v. Kansas City Southern Ry. Co., 339 Mo. 249, 96 S. W. (2d) 357. In that case the accident in question occurred in Oklahoma and, concededly, the Oklahoma law governed, as it does here. In the Gwaltney case we cited and quoted from Atchison, T. & S. F. Ry. Co. v. Bratcher, 99 Okla. 74, 77, 225 Pac. 941, wherein it is said that before the doctrine of last clear chance can apply it must appear either that the primary negligence of the defendant continued after the contributory negligence of the plaintiff ceased, or that some new primary negligence of the defendant intervened between the cessation of the contributory negligence and the infliction of the injury; that "If the primary negligence and the contributory negligence are coexistent and contemporaneous, the doctrine of last clear chance has no application. It cannot then be said that the primary negligence is the proximate cause of the injury." After referring to other Oklahoma decisions we said, 339 Mo. l. c. 257, 96 S. W. (2d) l. c. 361:

"As we understand the Oklahoma decisions, under all of them if the injured person had the last clear chance to avoid injury and negligently failed to do so he cannot recover on the last clear chance theory. Varying facts in different cases must of course be considered in determining whether or not the rule applies, as is shown in the numerous cases cited."

There is a material difference between the facts of the Gwaltney case and those of the instant case. In the Gwaltney case the plaintiff was injured at a highway crossing over the railroad. His automobile had stalled on the railroad track. He was behind it trying to push it off as the train approached and remained thus until too late for the train to stop in time to avert a collision. The engine struck the automobile, knocking it against the plaintiff and injuring him. He saw the approaching train in ample time to have retired to a place of safety and avoided being hurt but negligently failed to do so. We held he could not recover for his personal injuries. But in the instant case the deceased was obviously unaware of the approach of the train.

Deceased was negligent in sitting down on the track when a train was about due to come along, and going to sleep or losing himself in meditation, whether drunk or sober. In 45 Corpus Juris, page 997, section 551, we read:

"The care required of a person who has become intoxicated voluntarily is the same as that required of one who is sober. If he fails to exercise that degree of care for his own safety which an ordinarily prudent sober person would exercise under the same or similar circumstances, and such failure contributes as a proximate cause to the injury of which he complains, he is guilty of contributory negligence."

Many cases are cited in footnotes, which support the text. But this

does not wholly solve the question presented by the facts of the record before us.

In 45 Corpus Juris., page 994, section 545, it is said:

"*Obliviousness of peril.* The courts are not in entire agreement as to whether there can be a recovery by one who could, by the exercise of ordinary care, have extricated himself or his property had he been aware of the danger, but who fails to do so because he is unconscious of the peril. While there is authority to the contrary, it is generally held that recovery may be had in such cases."

See, also, Smith v. Gould (W. Va.), 92 A. L. R. 28, and extensive note, beginning page 47, particularly the portion thereof beginning page 86. In the principal case, in discussing the last chance doctrine, the West Virginia court said, 92 A. L. R. l. c. 31.

"The base of the rule is this: A plaintiff who has negligently placed himself or his property in a situation of imminent peril and is either unconscious of the situation, or unable to avoid the danger, or both, may nevertheless recover damages of the defendant who negligently inflicts injury, if the defendant could have avoided the injury after discovering the plaintiff's peril. This proposition is generally recognized in American and English cases."

Most of the cases cited in the note seem to sustain that doctrine.

None of the Oklahoma cases cited in briefs of counsel distinctly discusses and rules the exact point we are now considering and we have not found one that does. But the doctrine of last clear chance as announced by the West Virginia court in Smith v. Gould, supra, seems to be recognized and applied in St. Louis-S. F. Ry. Co. et al. v. Bryan, 113 Okla. 39, 237 Pac. 613. In that case deceased was driving a wagon across the railroad track at the intersection of said track and a city street. He was driving east and the train that struck him came from the north. There was evidence that as he approached the track there were two locomotives south of the crossing, one of which had been whistling and switching cars, and that the deceased was looking south (evidently unaware of the approach of the train from the north, though it is not distinctly so stated in the opinion.) The engineer saw the deceased approaching the track and that there would likely be a collision in time to have stopped. Judgment for the plaintiff was affirmed. In discussing the last chance doctrine, which had been submitted to the jury, the court said, 113 Okla. l. c. 41:

"It declares that the injured person may recover damages resulting from the negligence of the defendant, although he himself be guilty of contributory negligence, if the injury was caused more immediately by want of care on the defendant's part to avoid the injury after discovering the peril of the injured party."

The court further said,

"The defendants further contend that this instruction is erroneous for the reason that it did not contain a provision as to concurrent and

contemporaneous negligence of the parties, it being their contention that if the plaintiff and defendants were concurrently negligent, no recovery could be had, and in order for the plaintiff to recover, some negligent act of the defendants must be shown, which occurring, after the contributory negligence of the injured party had ceased, caused the injury. We do not agree with this contention. The last clear chance doctrine applicable here contemplates a danger which the engineer, having knowledge thereof, may avoid by due care on his part. To hold that if he, having the last clear chance to avoid the injury by the exercise of due care, is excused if the injured party's negligence continues or is concurrent, is to deny the application of the last clear chance doctrine. It, in effect, would be holding that the rule of contributory negligence would apply and be a defense under such circumstances. The failure of the engineer to perform his duty when he has knowledge of the person's peril and has the opportunity to prevent the injury by the exercise of due care, raises liability. In our judgment, the correct rule is that defendants cannot rely upon contributory negligence of the injured person as a protection where the injury was more immediately caused by the want of due care on defendants' part to avoid the injury after discovering the peril of the injured party."

In Chicago, R. I. & P. Ry. Co. v. Owens, 78 Okla. 114, a man was lying on the railroad track asleep or unconscious and was run over and killed by a train. There was evidence from which the court said a jury could find that the engineer discovered the deceased in time to have stopped before running over him. Complaint was made on appeal that the trial court had erred in giving two instructions, but the Supreme Court said, 78 Okla. l. c. 118:

". . . an examination of these instructions discloses that the court submitted the case properly to the jury upon the law applicable to a case, where the doctrine and law of the last clear chance applied, and upon the theory that the deceased was a trespasser, that the railroad company owed him no duty to look out for him, but only owed him the duty, after discovering him in a place of peril, to use ordinary care to prevent injury, and that the plaintiff could not recover unless the engineer actually saw the deceased in time to have prevented the accident. These instructions correctly state the law applicable to the case at bar."

There is no further discussion of the last chance doctrine. Judgment for the plaintiff was affirmed.

In Chicago, R. I. & P. Ry. Co. v. Pedigo, 123 Okla. 213, a man walking on the railroad outside but near the rail was struck and killed by a train which approached him from behind. There was evidence from which the court thought a jury could find that he had been unaware of the approach of the train and that those in charge of the train saw him in a position of peril in time thereafter to have stopped be-

fore striking him. The court said the issues made by pleading and proof as to liability under the doctrine of last clear chance "were submitted to the jury on proper instruction" and that the evidence was sufficient to support the verdict in favor of the plaintiff, administrator. There is no further discussion of the last chance doctrine but evidently the court considered it applicable.

After careful consideration it is our conclusion that plaintiff made a case to go to the jury.

■ We are of opinion, however, that the judgment must be reversed and the cause remanded for errors in the trial. First, it is contended that a fact essential to plaintiff's right to maintain the suit was not submitted to nor found by the jury. Plaintiff sued as surviving widow, for the benefit of herself and the minor children. In her petition she pleaded *in haec verba* two sections, 570 and 571, of the Oklahoma statute. By Section 570, when the death of one is caused by the wrongful act of another, the "personal representative" of the deceased may maintain an action therefor if the deceased might have maintained an action had he lived, the recovery to inure to the benefit of the surviving spouse and children, if any, or next of kin. Section 571 provides that when the deceased was a resident of the State and "no personal representative is or has been appointed" the action may be brought by the widow, or if there is no widow, by the next of kin.

Plaintiff pleaded· that no personal representative had been appointed and on the witness stand so testified. That was all the evidence on that point. Deceased was a resident of Oklahoma. The allegation of plaintiff's petition that no administrator had been appointed was put in issue by the general denial contained in defendants' answer. That question was not submitted to the jury. Plaintiff's main instruction submitting the ·case directed a verdict for plaintiff if the ·jury found that deceased "left the plaintiff, Mary Carpenter, as his widow, and any minor children mentioned in evidence," and hypothesized the facts to be found in order to charge defendants with negligence. It did not require a finding that no administrator had been appointed nor did any other instruction. No Oklahoma case is cited dealing with this exact question.

Our· own court has passed upon a somewhat analogous question. Our statute, Section 3262, Revised Statutes 1929 (Mo. Stat. Ann., p. 3353), authorizes suit by an administrator or executor if there be no surviving spouse, minor child, or father or mother of a deceased unmarried minor,· the recovery to be distributed according to the law of descents and distributions. In Titus v. Delano (Mo.), 210 S. W. 44, the suit was by an administrator. We said:

"The petition alleges that Silas Titus was 'an unmarried man and left surviving him no minor child or children, neither natural born nor· adopted.' It does not allege he left surviving him any child or chil-

dren or next of kin competent to take under him under the law of descents in this State. It has been decided by this court and the Courts of Appeals that such a petition states no cause of action. (Citing cases.) It is suggested the evidence tends to show Titus left a son, and that the defect in the petition might be cured thereby. The same contention was presented in the motion for rehearing in Lyons v. Railway, supra, and overruled. Further, this view could not save the judgment in this case. The question whether Titus left next of kin was an issuable fact. Respondent's instructions authorized a verdict without a finding on the point. This, alone, would preclude an affirmance."

To same effect see Lee v. St. L. Pub. Service Co., 337 Mo. 1169, 88 S. W. (2d) 337; Pyle v. City of Columbia (Mo. App.), 263 S. W. 474.

The fact that no administrator had been appointed was essential to plaintiff's right to maintain the action. The burden rested upon her to prove the facts necessary to recovery. The jury were so instructed, but were not required to find that essential fact. If the court may *assume* the existence of one fact necessary to the plaintiff's recovery which is denied by the defendant's answer, because the defendant has offered no rebutting testimony, why may it not assume as true all of the plaintiff's evidence which is not specifically controverted by evidence on the part of the defendant? It is not for the defendant to disprove the allegations of a plaintiff's petition upon which recovery depends but for the plaintiff to prove them. We consider the instruction reversibly erroneous in the respect above mentioned.

We think, also, prejudicial error inhered in the argument of plaintiff's counsel to the jury. Counsel said: "Gentlemen of the jury, by your verdict in this case you are going to tell the railroad that there cannot be in the State of Oklahoma or the State of Missouri, or any other state, murder committed down there south of Henryetta." Defendants objected to the statement that it was murder. Plaintiff's counsel repeated the statement "I say it was murder." Defendants again objected to the statement, and the court said "That objection will be sustained." Defendants then asked that plaintiff's counsel be reprimanded and the court merely said, "The jury will be admonished not to consider that remark." Defendants did not save exceptions to the court's failure to reprimand, wherefore plaintiff says they have waived it. But immediately following that episode plaintiff's counsel said to the jury, "I don't know what they call it, but if I killed that man and cut him to pieces, I say that they are guilty of murder." Defendants again objected to the statement and to counsel's persistence therein after the court had sustained objection thereto, and asked that the jury be discharged. The court said, "The objection will be sustained. The jury will be admonished not to

consider the remarks of counsel, but the motion to discharge the jury will be refused." Defendants duly saved exceptions to the court's refusal to discharge the jury.

That the statements of plaintiff's counsel were inflammatory and such as might well have aroused the passions of the jury we think clear and they were persistent in after the court had sustained objections thereto. They were without foundation or justification. Defendants were not charged with murder nor with the willful or wanton killing of deceased, but only with negligence, and their negligence, if any, was not grave, as we have shown.

We have often been called upon to consider complaints of improper arguments to juries and in not a few cases have felt obliged to reverse judgments on that ground. We shall not take space here to review the authorities and point out the remarks condemned in the various cases. Suffice it to say that in our judgment the mild ruling of the court was not sufficient to withdraw the poison injected by the above quoted remarks. Consult on this point: Neff v. City of Cameron, 213 Mo. 350, 369, 111 S. W. 1139; Smith v. St. Louis Southwestern Ry. Co. (Mo. App.), 31 S. W. (2d) 105; Williams v. Columbia Taxicab Co. (Mo. App.), 241 S. W. 970; Chaffin v. Kansas City (Mo. App.), 92 S. W. (2d) 917, 921; Monroe v. C. & A. Ry. Co., 297 Mo. 633, 249 S. W. 644.

■ Complaint is made of the admission of certain evidence which should be mentioned in view of the possibility of another trial. Over defendants' objections plaintiff introduced evidence tending to show that some years prior to the accident there had been a "footwalk," as plaintiff calls it, over the above-mentioned trestle. Plaintiff contends that was an "invitation" or license for pedestrians to use the track. It was removed, as plaintiff's evidence showed, about three years prior to the accident. When plaintiff made that showing defendants moved to strike out that evidence, which the court refused to do. Defendants' evidence as to that "walk" was that some years before there had been a mine just north of the trestle with a switch leading thereto near the north end of the trestle and that the so-called walk had been built to be used as a platform for railroad employees when engaged in coupling and uncoupling cars in switching movements for the mine switch. The mine was abandoned about three years before the accident and the "walk" was then removed. Whatever the original purpose of the walk or platform was, if it ever constituted an invitation or license to pedestrians to use it as a walkway, such invitation or license had been withdrawn long before this accident occurred. We think that evidence should have been excluded.

Indeed, in view of the fact that plaintiff's action is bottomed upon *discovered*—not *discoverable*—peril, the fact that, as we have shown, the engineer and fireman did not owe deceased the duty to be on the

lookout for him, and the further fact that, in any event, according to plaintiff's own evidence both engineer and fireman *were* keeping a lookout, it is difficult to perceive where any of the evidence of use of the track by pedestrians had a place in the case. It would seem that it but tended to confuse the issues and to distract the jurors' minds from the real issues involved.

Defendants contend that the verdict is excessive but since we are remanding the cause that question need not be considered. There are some other points raised which we think need not be discussed. The judgment is reversed and the cause is remanded. *Westhues* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.