ALBERT ANGELO v. L. W. BALDWIN and GUY A. THOMPSON, Trustees of MISSOURI PACIFIC RAILROAD COMPANY, a Corporation, Appellants.—121 S. W. (2d) 731.

Division One, November 19, 1938.

*Thos. J. Cole* for appellants.

*Eagleton, Waechter, Yost, Elam & Clark* for respondent.

312

GANTT, J.—Action for personal injuries. Plaintiff was injured by a moving car while "picking coal" from the ground in defendants' railroad yard at 11:30 A. M., on February 14, 1934. Judgment for $30,000 and defendants appealed.

The petition alleged that defendant saw, or should have seen plaintiff in a position of imminent peril in time, by the exercise of ordinary care, to have warned him of the switching movement of the car and negligently failed to do so. The case was submitted to the jury on this allegation of negligence.

Defendants assigned error on the refusal of the demurrer at the close of the evidence. They contend that at the time plaintiff was a trespasser and for that reason the defendant trustees owed him no duty except to refrain from wantonly and willfully injuring him.

The yard is located partly in the southern part of the city and partly in the county of St. Louis. Immediately north of the switch yard is the bridge over the River Des Peres. The two main tracks extend north and south over this bridge. The switch connecting the main tracks with the "lead switch track" is just south of the south end of the bridge. The twenty̦ switch tracks, west of the main tracks, extend north and south and connect with the "lead switch track." The several switch stands are located on the west side of the "lead switch track." The surface of the yard is cinders and slack ballast built up quite a distance above the surface of the ground adjoining the west side of the switch yard. The ground west of the yard is covered with weeds, brush and trees and was known as "the grove." In the grove was the foundation of an abandoned government munition plant and a "night and day camp."

The street known as Broadway is one-quarter of a mile west of the switch yard. Immediately east of the main tracks is a switch track known as "boat yard lead," and east of the last named track is the Titanium Pigment Company plant. East of said plant is the Mississippi River. The switch yard is much used in "making up" and "breaking up trains." Coal was frequently jarred from cars and locomotives and fell on and between the switch tracks. "Coal was almost constantly in and about said tracks."

The car in question was kicked south onto the lead track and through the switch to track No. 7 and south on track No. 7 to the point where plaintiff was "picking coal" from the ground. There was no one on the car and no warning or signal of any kind was given as the car moved south on the lead track and on switch track No. 7.

We adopt, with slight changes, all of plaintiff's statement of the evidence material to a review of the ruling on the demurrer.

## Plaintiff's Evidence.

"Albert Liverinia Angelo, the plaintiff, so far as his testimony is material to this appeal, testified that, at the time of his injury, and for some time prior thereto, he lived at 8018 Riley Avenue, in the City of St. Louis, which was near to, and northwest of, defendants' switch yard; that from October, 1933, until the date of his injury, he had been in defendants' switch yard many times, practically every other day, to pick up coal in the tracks there; that on these trips to defendants' switch yard for coal he would generally get between half a tow sack and a full tow sack of coal; that he had, also, been down in that yard on three or four occasions to seek work at the pigment company; that, on these trips to this railroad yard, he would

invariably see lots of people in those yards who were not railroad men, and who would be picking up coal which was, scattered all about on the different tracks there; that he would, also, see the railroad men engaged in switching the cars in the yards, and that none of these men ever said anything to him about not picking up the coal on the ground there, although they would frequently say, 'Hello,' or something like that, to him, and that he had seen defendants' watchman, Schmalz, in the yards there, and on one occasion Schmalz told him to be careful, but never did say anything to him about picking up coal, nor disturb him in any way in his picking up coal. Plaintiff further testified that, in walking from the south side of the River Des Peres eastwardly about one-fourth mile from Broadway to defendants' switch yards, one walked through 'the grove,' which was all open upon a path leading up to defendants' yards about opposite a small office building south of the water tank there; that on the occasions when he would go to defendants' yard he would see lots of other people, employees of the Titanium Pigment Company walking east and west across the tracks in the railroad yards, walking on what he called a path which led from near the water tank westwardly to one of the paths leading down the embankment from defendants' yards to the path in the grove, as well as on another path some distance south of the first one.

"Plaintiff further testified that, on the morning of his injury, he went to the defendants' switch yard, with a tow sack in his hand, to get some coal, entering the yard from the north across the Des Peres River bridge and walking southwestwardly to track No. 7 along the much-used path on the west side of the lead track; that he then saw a small pile of coal on the ground just east of track No. 7 and about 100 to 125 feet south of the lead track, looked about and saw no moving train and no switching being done, and walked south along the east side of track No. 7 to get to the small pile of coal; that on the day of his injury, at various points in the yard farther south than the small pile of coal, 'quite a few' other people were picking up coal in the tracks; that, after he started south from the lead track to get to this small pile of coal, Mr. Minahan, who was admittedly one of defendants' employees, spoke to him and said: 'Hello,' and plaintiff replied in kind, Minahan then being some 75 to 100 feet away, and on the lead track near track No. 7; that he (plaintiff) then walked directly south a few steps to the pile of coal and looked about, but saw no car or train moving in the yard, and then bent over, facing southwardly, to pick up the coal; that while he was picking up the coal and putting it in his sack, and after he had been doing that for a short time, and after having gotten about a quarter of a sackful of coal, he was struck from behind, on the right side, by a car moving southwardly on track No. 7 and caused to be thrown to the east of the track, with his legs under the car, and

sustain the injuries for which he sued, all of which plaintiff estimated took place within five minutes after he had been spoken to by Mr. Minahan.

"Plaintiff further testified that, after Mr. Minahan had said 'Hello,' plaintiff again looked about the yard and saw a train up north of the bridge at the north end of the yard, but it was not moving, and that during the time he was picking up the coal, and until he was injured, he did not hear or receive any signal or warning of any kind or character of any movement of cars or trains.

"Plaintiff further testified that the only fence which he knew of anywhere near the west part of defendants' yard was an old fence, which ran in a northerly and southerly direction, about 150 feet west of the lead track, and down in the grove, and that this fence was old and broken down so that you did not have to crawl through or climb over it, but you could 'go right on through without touching anything whatever. It is all wide open.' "

C. J. Minahan, a switchman in the crew which caused the injury to plaintiff and who had been employed in the switch yard for twenty-two years, testified that when a member of the crew wanted to move a car from the lead track to one of the switch tracks he would throw the switch by hand and would be facing south looking down the switch track upon which he intended the car to go; that he would also have to look down the track to see whether there was room enough for a car to get in on it before he opened the switch; that on the day of plaintiff's injury he went down and set the lever on No. 7 switch before any cars came down on the lead track and at the time he knew that the next movement of his train was going to be to immediately kick a car into No. 7 track; that he was not certain that he was the man who threw switch No. 7 at the time the car that injured plaintiff went on to track No. 7; that when he spoke to plaintiff Angelo, he (Minahan) was right at No. 7 switch and that Angelo was standing on the lead track seven or eight feet south from the switch stand on No. 7; that he did not see Angelo at any other time or at any other place that day; that Angelo had a sack in his hand, but that he (Minahan) did not know where Angelo was going; that he thought Angelo was going to pick up coal but that he did not know where he was going to "pick it up at;" that he had seen Angelo and other people picking up coal in various parts of the yards on numerous occasions, particularly in cold weather, but neither he nor any of the crew at any time ever said anything to the people about not picking up coal in the yard.

This witness further testified that at the time he saw Angelo he did not say anything to him about the fact that a car was just about to be kicked down there on to switch track No. 7, and that no warning at all was sounded before the car was kicked down the lead and into track No. 7; that at the time the car was kicked down the lead

track and into track No. 7, the train which kicked, the car was up near the bridge over the River Des Peres.

The witness further testified that outside of the old fence about one hundred fifty feet west of the lead track there was no other fence around there at all and that there were no signs anywhere in the yard which said "Keep Out" or "No Trespassing," or anything of that character.

William Ritter testified that he was employed at the Titanium Pigment Company plant from 1926 until March, 1935; that Plaintiff's Exhibit A shows a part of the switch yard, and also shows paths which had been used by the pigment company's employees, and that a person using those paths would get onto defendants' switch yard at a point a little to the south of where the parked automobiles are shown in Plaintiff's Exhibit B; that prior to February, 1934, he used these paths daily for about three months to get up into defendants' yard and cross the switch tracks from east to west at a point just about opposite the water tower shown in Plaintiff's Exhibit B; that there were three shifts of employees at the Titanium Pigment Company, consisting of between 600 and 700 people, and that about one-third of those employees would walk back and forth across defendants' yard and the switch tracks therein, to and from their work daily; that he at no time ever saw or heard any employee of the Missouri Pacific Railroad tell those people not to walk across the switch tracks, and that the employees of the pigment company who lived in the city used paths and the switch tracks somewhat farther north in the yard than those employees of pigment company who lived in the county. This witness further testified that, during the entire time he worked at the Titanium Pigment Company he would every day see people, both white and colored, picking up coal on various parts of the tracks in the switch yard; that, once in a while, there would be only one person doing that, and at other times there would be five or six, but he never saw any of those people picking up coal stopped from doing so by any of the railroad's employees, and that there were three or four paths leading from "the grove" up the embankment to defendants' switch yard, and that all of these paths were used by these people who crossed the switch yard going back and forth from the grove to the pigment company's plant.

The witness further testified that, prior to 1934, there was no fence around the Titanium Pigment Company's plant, but about the beginning of that year a fence was put up along the west side of the pigment company's property, which had an entrance at the north, and another farther south, and that the pigment company's employees had to walk across the switch tracks in the switch yard in order to get into the southern entrance of the fence.

F. J. Hoagland testified that on the occasion in question he was walking south on the railroad tracks in the switch yard, with the

intention of going west across the switch tracks, and through the grove west of the yard, to Broadway; that, when he was some distance south of the bridge, he saw a box car cut loose from a train, which was then up near the River Des Peres bridge, roll free and unattached about 100 feet down the lead track, through a switch into one of the switch tracks, and then down the switch track and strike a man; that there was no signal or warning given with reference to the movement of that car; that he first saw the man when the car was about thirty feet from the man; that after he saw the man struck he went down to the scene of the injury and then recognized the plaintiff, Angelo, whom he knew; that after the crowd had gathered around and Mr. Angelo had been taken away, he went on west across the switch tracks, down the embankment, and on the path through the grove over toward Broadway, and that he had known of the existence of this path for many years.

Defendants' Evidence.

Francis J. Daugherty testified that from August, 1929, to November, 1933, he was employed as a watchman by the Missouri Pacific; that he rode "drags" or "cuts" of cars through the switch yard to keep people from stealing coal off them; that he had seen plaintiff pick up coal in the yard on several occasions from 1930 to 1932 when he (Daugherty) was stationed permanently in that yard and that on one occasion he ordered plaintiff out of the yard, telling plaintiff he was liable to be injured if he did not get out and stay out. On cross-examination he testified that he saw the Titanium Pigment Company's employees walk across the yard; that the people he was looking for were those that were taking coal off the cars; that he saw people in the switch yard picking coal up off the ground about the tracks and would warn them that they might get hurt; that he continued to warn them to stay out of the yard; that he sometimes tried to scare them by threatening to lock them up; that he did not care for them picking up coal, but they had no right in there and it was the danger they were in from switching the cars.

Herbert Schmalz testified that he was a watchman in the employ of defendants since October 14, 1933, and assigned to the switch yard; that he had seen plaintiff in that yard picking up coal at least five times within a period of six weeks prior to plaintiff's injury; that there was no fence at all up around the yard, nor were there any signs saying "Keep Out," "No Trespassing," or anything like that; that the entire north half of the west side of the yard was "wide open;" that there was a fence which ran in a northerly and southerly direction about 150 feet west of the lead track, and extending from the "night and day camp" on the south, northwardly to a point about opposite No. 6 switch and then extending westwardly from that point; that that was not a Missouri Pacific fence and was not on Missouri Pacific property; that he recognized Plaintiff's Ex-

hibit A as showing a path which led up to the switch yard and from the grove and about directly west of the water tower, and that he would see people daily coming from Broadway through the grove up this and other paths and into defendants' yard.

P. S. Mitchell, chief special agent for the Missouri Pacific system, testified with reference to the instructions given by him to the special agents and watchmen in defendants' employ, and that he and his men did not go into court and prosecute them, when they could help it, for picking up coal; that the prosecution was for the purpose of preventing stealing from a pile of coal in the yard or from a car; that coal is frequently scattered along the tracks that had not been shoved from a car.

Harry T. McCauley, sergeant of special officers of the Missouri Pacific, testified with reference to the duties of the special officers and watchmen concerning trespassers, ''coal thieves and coal pickers and everything,'' and particularly with reference to watchmen, who rode the drags of coal cars. With reference to the switch yard, he testified as follows: ''A. Well, conditions are bad on different things down there. Some people go over there from being working down there, and people go through walking; that is quite a lot of young boys and girls that go through that yard to Cliff Cave.''

Jake Mathes, the fireman in the crew which was operating the train resulting in plaintiff's injury, testified with reference to the switching movements made. On cross-examination he testified that for years prior to the time of plaintiff's injury he had seen members of the public in and about the switch yard ''on that path,'' and had seen people picking up coal on the switch tracks in that yard; that he had seen people walking across over there to the Titanium plant; that he knew where a path came up over the west side of the yard, and he had seen people going up that path.

J. H. Fox, yardmaster at the switch yard, testified that there was a path leading from the grove up the embankment to the lead track around No. 5 switch; that that path showed clearly in the mud and dirt of the embankment, and west of there; and that the entire surface of the switch yard was a hard surface of cinders and slack ballast; that within two months preceding plaintiff's injury he had seen ''coal pickers'' picking coal in that yard ''on a good many occasions.''

A. L. Jackson, the locomotive engineer of the train crew engaged in the switching operations which resulted in plaintiff's injury, testified with reference to such operations, and also testified to the effect that since the watchman, Schmalz, had been employed in the switch yard he (the witness) had seen ''many a'' coal picker in the yard.

Walter J. Cliff, a switchman in the crew of the train involved, testified to the effect that some two or three minutes after Minahan had been at the switch stand for track No. 7 he (the witness) went to the switch stand, pulled the lever so as to realign the switch for

the car to go into track No. 7, and then gave the signal for the car to be kicked in onto that track, and that after the car had been kicked in onto that track he first saw the plaintiff injured and on the ground between tracks Nos. 6 and 7, the plaintiff then being about 100 feet south of the lead track, and due south of the witness. He further testified that he had worked daily in the switch yard for more than twenty-five years; that he had never seen the watchman Schmalz tell anybody to get out of, or eject anybody from, that yard, whether or not they were trespassers or coal pickers; and that after Schmalz came to work there, there were "not quite so many" trespassers and coal pickers, there being some little decrease in the number of people who came into the yard and picked up coal from the time Schmalz went to work until the plaintiff was injured.

John M. Byrne, a switchman employed in the yard daily from the time the watchman Schmalz went to work there until plaintiff was injured, testified that, after Schmalz was first employed, "there hasn't been so many" coal pickers in that yard "as there used to be;" that he thought the number had decreased about 50 per cent; that there were a great number of people down there picking up coal, off and on, dependent upon the condition of the weather; that he could not say for certain the amount or number of persons picking up coal in the yard at any time; "some days there would be more and some days less, according to the weather;" and, with reference to the reduction, estimated by him at 50 per cent of the number of persons picking coal in the yard, he testified as follows: "A. That was according to the weather, I said. Some days there would be a whole lot, and other days there wouldn't be near so many." He further testified that he did not know about the watchman Schmalz ejecting people from that yard.

Charles E. Sanders, a switchman in the train crew engaged in switching operations at the time of plaintiff's injury, testified with reference to such switching operations. He testified, with reference to the yard as follows: "A. Well, yes, sir. I seen there seemed to be people in there picking up coal, so many people in that yard; but that seemed to slacken up a bit; but you could see people in there once in a while picking up coal. . . ."

L. R. Martin, a switch tender employed by defendants in the yard testified to the effect that during the six months previous to plaintiff's injury, he had seen plaintiff in the yard several times—at least a dozen times; and that the witness, himself, had spoken to plaintiff, the witness's testimony with reference to this being as follows: "A. Yes, sir. I told him to be careful one day. One day we were switching cars, I was passing the signals, and every time we stopped, he came down, and I hollered at him."

I. Defendants contend that there was no evidence tending to show that either member of the switching crew saw plaintiff in a position of peril.

The switchman Minahan testified that he set the lever on No. 7 switch before cars moved on the lead track; that at the time he knew that the next move would kick a car to track No. 7; that he would be facing south and would look to see if there was room for a car on track seven before he opened the switch; that plaintiff was standing on the lead track seven or eight feet south of said switch stand at the time and he spoke to him; that he (plaintiff) had a sack in* his hand but that he (Minahan) did not know where plaintiff was going to "pick up coal;" that he did not see him at any other time or place that day.

There was no evidence tending to show that the other members of the crew knew that plaintiff was in the yard. Furthermore, the testimony of Minahan did not tend to show that he saw plaintiff in a position of peril.

II. Defendants also contend that they were under no duty to discover plaintiff's peril and warn him of the approaching car.

An exception to the trespass rule is stated as follows:

"If a railroad company permits the public for a long time to travel or habitually pass over its track at some given point, or use it as a footpath between different points, without objection or hindrance, its consent or acquiescence in such use may be presumed, and it will be bound to manage and run its trains with reference thereto. In such cases it has been said that the company and the people have a common right or joint use in the track, as a public way, and the right of each must be regarded." [22 R. C. L., p. 937; Mayfield v. Kansas City Southern Ry. Co., 337 Mo. 79, 85 S. W. (2d) 116, l. c. 123, 124.]

We also have ruled that it was the duty of a railroad to discover the peril of children who had for many years used a limited area of its yard and adjacent alley as a playground. [Burnham v. Railroad, 340 Mo. 25, 100 S. W. (2d) 858.]

From these exceptions to the trespass rule, plaintiff argues that if railroad employees should discover the peril of a person using a path across the tracks, and should discover the peril of a child using a limited area of its yard as a playground, defendants' employees should be required to exercise ordinary care to discover the peril of plaintiff and others engaged in taking coal from the yard. We do not think so. For several years plaintiff and others had been taking coal from the yard. There was no evidence tending to show that defendants' yard employees were authorized to consent to the taking of said coal. Furthermore, there was no evidence tending to show that defendants consented to plaintiff and others taking coal

from the yard. Plaintiff was not in the yard under a right of user by the public. He was in the yard for the purpose of taking property that did not belong to him. Clearly, it would be absurd to rule that plaintiff and other "coal pickers" acquired the right to jointly occupy the yard with defendants. To so rule would compel the defendants to equip every car with a signal device or provide a switchman to ride every car moving in the yard. In other words, it would prevent defendants from using the yard for the purposes for which it is maintained.

Futhermore, we have ruled that employees working in a railroad yard, including switchmen working in said yard, are under the duty of "looking out for themselves," in the absence of a rule or custom to the contrary. [Goodwin v. Railroad, 335 Mo. 398, 72 S. W. (2d) 988.] If the duty is upon the employees to "look out for themselves," it follows fhat the "coal pickers" in the yard should also "look out for themselves." Plaintiff was a trespasser upon the property of defendants. He was there solely for his own profit and defendants were under no duty to discover his peril. He cites decisions of this court as follows: Burnham v. Chicago, Great Western Railroad Co., 340 Mo. 25, 100 S. W. (2d) 858; Yakubinis v. M. K.-T. Railroad Co., 339 Mo. 1124, 100 S. W. (2d) 461; Dalton v. M., K. & T. Railroad Co., 276 Mo. 663, 208 S. W. 828; Privitt v. St. Louis-S. F. Railroad Co., 300 S. W. 726; Murphy v. Wabash Railroad Co., 228 Mo. 56, 128 S. W. 481; Ahnefeld v. Wabash Railroad Co., 212 Mo. 280, 111 S. W. 95; Eppstein v. Mo. Pac. Railroad Co., 197 Mo. 720, 94 S. W. 967; Crossno v. Terminal Railroad Assn., 333 Mo. 733, 62 S. W. (2d) 1092; Mayfield v. K. C. Southern Railroad Co., 337 Mo. 79, 85 S. W. (2d) 116. The facts in the cited cases differ from the facts in the instant case.

The judgment should be reversed. It is so ordered. All concur, except *Lucas, J.*, not sitting.