MARY COCHRAN v. GUY A. THOMPSON, Trustee of the Missouri Pacific Railroad Company, Appellant.—148 S. W. (2d) 532.

Division One, March 13, 1941.

*Thomas J. Cole* and *Spradling & Strom* for appellant.

*Lawrence E. Tedrick, Byron Kearbey* and *James V. Conran* for respondent.

HYDE, C.—This is an action for damages for wrongful death, under the penalty section. [Sec. 3652, R. S. 1939, sec. 3262, Mo. Stat. Ann. 3353.] Plaintiff had a verdict for $10,000. Defendant has appealed from the judgment entered.

Defendant contends that the court erred in refusing to direct a verdict for defendant at the close of the evidence. Considering the evidence most favorably to plaintiff, the following facts appear. Plaintiff's husband, Joseph Cochran, was struck and killed by defendant's train, about a half mile south of the south city limits of Poplar Bluff and about a quarter of a mile north of defendant's south yard limit sign. Defendant's track (defendant had double main line tracks but no switch tracks here) ran in a general north and south direction and were almost level, but there was a slight grade to the north. The track was straight for several miles. Near the city there was a trestle over a drainage ditch. One mile south of the city limits an east and west road crossed the railroad. This was called the "Williamson Crossing." Defendant's yard limit sign was about a quarter of a mile north of this crossing. About three quarters of a mile east of the Williamson Crossing, there was a road known as the Pike Slough Road which ran due north, getting closer to the railroad as it approached the city limits. About one quarter of a mile west of the Williamson Crossing there was another public road running north which ran into Highway No. 67, southwest of the city, about three-fourths of a mile from the city limits. The Frisco Railroad had one track which paralleled defendant's tracks about 100 feet west. There was a good fence on the east side of defendant's track and another good fence on the west side of the Frisco track. From the Williamson Crossing "to Poplar Bluff the land is pretty well cleared." There were cattle guards at the Williamson Crossing. There was a private farm crossing, from 200 to 300 feet south of the point where Cochran was struck by defendant's train, which had gates on each side of the tracks, but those were kept closed and wired. It was only possible to get on either track by going over cattle guards, climbing a fence, or opening gates.

Cochran started to walk south on defendant's tracks with another man, Turner, who was one of plaintiff's witnesses, on the afternoon of June 11, 1938. It was a clear day and the track was dry.

They had been drinking in Poplar Bluff and consumed more liquor as they walked down the track. Cochran said he was going to sit down and rest. Turner tried to get him to go on, told him a train was coming through and might hit him, and did all he could to get him off the track. Turner finally went on and left him sitting on the track. Defendant's freight train of fifty-five cars came north about 5 P. M., on the east track, and ran over Cochran. The fireman, called as a witness by plaintiff and the only plaintiff's witness who saw the occurrence, said that the train approached the yard limits at about 50 miles an hour; that the train was supposed to stop "up at the north end of the yards . . . something like 1½ miles" north of where Cochran was struck; that the engineer made a service application of the brakes approaching the south yard limits; and that between one-quarter and one-half mile away he saw an object on the track. The fireman was on the west side of the engine. He said to the engineer, who was on the east side of the engine, "it looks like something on the track." The engineer "just nodded his head." The fireman also said: "When we saw this object on the track we had slowed down to about 40 miles an hour and were between a one quarter and one-half miles away. . . . We were traveling at about 35 miles an hour and continued to reduce our speed. . . . He said the bell rang at Williamson Crossing and the whistle was also blown, and the whistle was also blown between the crossing and the point where Cochran was killed." He also said that, after the train struck Cochran, "we traveled about 400 feet before the train came to a stop." He further testified that he first discovered the object was a man when the engine was 250 to 300 feet away. He said: "As I watched it I just decided as it was absolutely motionless it was a roll of brown paper. . . . He was hunkered down right against the west rail with his head lying on the ties or ground. . . . He wore khaki clothes, or they were light brown. (Evidence also showed gray shirt) . . . He was on his knees and settled down with his feet under him. . . . His head was toward the south or toward the train. . . . (Upon discovering the object was a man) I just turned my head and he (the engineer) grabbed the whistle with one hand and the brakes with the other. . . . The train went 800 or 900 feet before it stopped and I consider that a good stop. · When I first saw the object on the track and learned that it was a human being our train was about 250 or 300 feet away and it was not possible to stop the train in time to avoid hitting Cochran."

The brakeman also testified that as they came within the yard limits they were required to watch the signal lights over the track about a half mile beyond the place where Cochran was struck. These lights determined the course of the train through the yards. "Green means clear, and if we get a yellow signal it means to head in the yard, and if it is red we stop." On this occasion they got a yellow

light, which meant they should head into the yards at 10 miles per hour, to go on a side track. The engineer, who was called as a witness for defendant, said that he was getting ready to do that. . He also said that when he first saw the object on the track about one-half mile away he thought it was a piece of brown paper and that when about 250 or 300 feet away he ''saw it was a man and shut off the throttle and applied the emergency, and turned on the sand.'' He further stated that he started the whistle to blow about one quarter of a mile south of the Williamson Crossing and blew it until he passed the crossing; that the engine bell was also ringing; and that he blew alarm whistles when he discovered the object was a man. The brakeman, also called as a witness by defendant, testified that he was in the gangway between the engine and tender, leaning out; that he first saw the object when 600 or 700 feet from it; that he discovered it was a human being about 300 feet away; that ''the first thing (he) recognized about this man was his red head;'' that ''the sun was shining right against his red head and (he) saw it at a distance of about 300 feet;'' and that ''his back was about ten inches above the rails.'' Defendant had corroborating evidence as to whistling for the Williamson Crossing and also whistling again. A man walking south on the tracks, meeting the train, heard the last whistles when about a quarter of a mile from it. He was looking down the track but saw nothing on it. There was no evidence to the contrary as to this whistling. Cochran was found under the ninth car (about 400 feet from the engine) when the train was stopped.

Plaintiff had evidence as to tests of visibility made by witnesses at request of plaintiff's attorneys. A man ''sat down on the rail and leaned his head on the track'' or got ''down on his hands and knees,'' and witnesses ''between 800 and 900 feet'' south on the track ''could recognize him as a man,'' but ''couldn't tell'' at a quarter of a mile. Plaintiff also had the testimony of a former ''air brake mechanic and demonstrator,'' that ''a freight train consisting of the 1400 class steam engine with a tender and 55 cars part empty and part loaded traveling along a dry railroad track at a rate of speed of 32 miles an hour with service brakes set,'' could be stopped with the air brakes, without damage, in ''275 or 300 feet.''

Plaintiff's theory is that defendant was liable if the trainmen ''by the exercise of ordinary care could have seen'' Cochran (and the court so submitted the case) because there was sufficient evidence of user between the City and the Williamson Crossing to authorize the jury to find that defendant had such lookout duty over this part of its track. Plaintiff's had evidence on this issue, as follows:

(Bridell) ''The people, who live west of the railroad track, use it all the time around Williamson Crossing and they have used it all my life. I see people riding bicycles up and down there. . . . The only way that travelers can get on the railroad track is to climb

over the fence, open the gate, which is kept wired, or go over the cattle guards at the crossing.

(Lynch) "When I worked on the track (for six years as a section man) and up until June, 1938, people used it walking to and from Poplar Bluff. It is used more during the hunting and blackberry season. . . . I have seen 15 or 18 a day. . . . There were some foot paths along the railroad when I worked there. . . . In order to get on the track you would have to cross these cattle guards, or walk the rails, or climb over the fence.

(Eichelberg) "In the spring and summer people go berry picking and in the fall they go hunting, but they go down the track every day. . . . Some days possibly 15 or 20 and on Sunday I would see maybe 40 or 50 walk down there and back.

(Wright) "The railroad track is used by the people. I have used it myself. I live about five miles from town and about $2\frac{1}{2}$ miles from Harvell. . . . The tracks are fenced on both sides. There is a cattle guard at the south entrance of the tracks. In order to get on the track it is necessary to walk the rails or cross over that cattle guard."

The population of Poplar Bluff "is between 10,000 and 11,000." It was shown that there were farm houses on the roads, on each side of the railroad, between the Williamson Crossing and the city, and that the families who lived on these roads used the road to go to town. Defendant's evidence showed a use of the track by "an average of two or three persons per day," and that the bicycle riding was after the accident. Defendant also had evidence that while there was "an average of about two people a day for 365 days, there are days that you don't see anyone;" that "the Frisco tracks have dirt and ours has ballast, . . . and we have rocks, tiff, chat and crushed rock and that is hard to walk on;" and that "about 90% of the travel is on the Frisco track." Admittedly more people used the tracks during berry picking season than at other times, but in addition to other travel shown, there was also use by hunters and by boys going to a swimming hole.

However, this court does not hold that the right of a railroad to expect a clear track on its private right of way can be taken from it over a long section of its track, in the open country outside city limits, where it is completely fenced and guarded, merely because people go on it by climbing over or through such fences or guards and use the track for travel parallel to the direction of the right of way. If such open country travel will take away one mile, why not two or five miles? The latest pronouncement of the Court en Banc on this matter is "that only to places of limited extent, as are used for access to shops, mines, industries and work camps, may the rule of waiver of the right to expect a clear track be applied," outside of cities or concentrations of population. [Yakubinis v. M.-K.-T. Ry.

Co., 345 Mo. 943, 137 S. W. (2d) 504; see also English v. Wabash Ry. Co., 341 Mo. 550, 108 S. W. (2d) 51; Crossno v. Terminal Railroad Assn., 333 Mo. 733, 62 S. W. (2d) 1092; Frye v. St. L., I. M. & S. Ry. Co., 200 Mo. 377, 98 S. W. 566.] Moreover, as the Fry case commented on lack of evidence "to establish the night use" of that defendant's track for travel, so here there is a complete absence of any evidence to establish use of this defendant's track for lying down. [See Trigg v. W., L. & T. Co., 215 Mo. 521, 114 S. W. 972; Ayers v. Wabash Ry. Co., 190 Mo. 228, 88 S. W. 608; Carpenter v. Kurn, 345 Mo. 877, 136 S. W. (2d) 997.]

We have held that the right to expect a clear track also applies to switch yards even though people do come into them for their own purposes regardless of warning signs or fences. [Angelo v. Baldwin, 343 Mo. 310, l. c. 321, 121 S. W. (2d) 731; Docoulmobier v. Thompson, 343 Mo. 991, 124 S. W. (2d) 1105.] In the Angelo case, it was pointed out that in such yards, since it is "the duty . . . upon the employees (authorized to be there in their work) to 'look out for themselves,'" persons whose presence there is unauthorized "should also 'look out for themselves.'" Section men and other employees working on railroad tracks in the country "must look out for their own protection from trains." [Goodwin v. Mo. Pac. Ry. Co., 335 Mo. 398, 72 S. W. (2d) 988, and cases cited.] We see no good reason why the same rule should not apply to persons who climb fences and go over cattle guards or other obstructions to walk the tracks through the open country. Plaintiff cites and relies upon such cases as Ahnefeld v. Wabash Ry. Co., 212 Mo. 280, 111 S. W. 95; Eppstein v. Mo. Pac. Ry. Co., 197 Mo. 720, 94 S. W. 967; Wise v. C., R. I. & P. Railroad Co., 335 Mo. 1168, 76 S. W. (2d) 118; and Burnam v. C., G. W. Railroad Co., 340 Mo. 25, 100 S. W. (2d) 858. The Eppstein, Wise and Burnam cases were all cases of user inside an incorporated city. User at a place where there is a very considerable population living adjacent to the tracks in a city, or even a work camp, mine or industry, is essentially different from user in open sparsely settled county districts outside city limits. In the Ahnefeld case the user was at a place not fenced near the railroad's Carrolton depot, which was a mile and a half from the business part of town but about which there were business and other buildings "forming a kind of a village . . . called South Carrolton." Furthermore, in none of these cases was the person struck "hunkered down" against a rail with his head on the ties. We hold that the evidence of user is insufficient to place upon defendant the duty of keeping a lookout to discover a man in such a position at such a place.

Plaintiff further contends that in any event it made a case for the jury on actually discovered peril. Plaintiff says "there was ample evidence in the case that the enginemen actually saw the deceased on the track in time to have stopped the train before striking him,

. . . The jury could have believed the engineer told the truth when he said he saw the object when half a mile away and disbelieved him when he said he did not recognize it as a man in view of the fact that there was evidence showing that the object could have been recognized as a man for a distance of 800 to 900 feet.'' (One trouble with this argument is that the only witness to the occurrence called by plaintiff said the same thing.)

The contention has, however, been adversely ruled by the court in Voorhees v. C., R. I. & P. Railroad Co., 325 Mo. 835, 30 S. W. (2d) 22, 70 A. L. R. 1106. [See annotation 70 A. L. R. 1116, showing that the weight of authority supports the Voorhees case.] The rule is stated (70 A. L. R. 1116), as follows:

■ ''The mere discovery of an object on the track not discernible to be a human being does not impose on the employees in charge of the train the duty to stop or slacken the speed of the train, unless the circumstances are such as would lead a reasonably prudent man to believe that the object was probably a human being. Hence, in the absence of such circumstances there is no negligence which will render the railroad company liable.''

As to plaintiff's tests of visibility, this court in the Voorhees case, overruling a previous holding of the Kansas City Court of Appeals (7 S. W. (2d) 740) ruled, as follows:

''We are unable to agree with our brethren of the Court of Appeals when they ruled that the jury could properly infer that the engineer did recognize the object on the track as a human being, because other persons occupying a less favorable position for observation, upon subsequent experiment and at a point where the train could have been stopped, could and did see that a similar object was a human being. Such ruling necessarily presupposes a duty upon the part of the engineer to discover that the object on the track was a human being. Under the circumstances and at the particular place in question, the engineer was under the duty only to act upon what he actually discovered and not upon what he might have discovered.''

■ In other words, that contention is an indirect way of arguing for imposing liability upon defendant if the engineer ''could have seen'' that the object was a man. Also, it is obvious that there is a great difference between testing the distance at which one, standing still, can tell that he is looking at a man, when he knows where he is and who he is, and the determination, as to whether an unknown object on the track is animate or inanimate by an engineer on an engine running from thirty-five to forty miles per hour, with the duty of watching signals directing the course and speed of his train. We must hold that this mere showing, of such tests, does not alone amount to substantial evidence that the trainmen on the engine (or either of them) did discover there was a human being on the track sooner than they said they did. If this is true, then even under the evidence of plain-

tiff's expert (which told nothing about time required to set the brakes) it was impossible to stop the train in time after the actual discovery. Furthermore, there was no showing of circumstances in this case which "would lead a reasonably prudent man to believe that the object was probably a human being." In fact, the circumstances show the contrary. The object was motionless, and it was in a place and position in which no one would expect to find a human being. Moreover, the engine whistle had been blowing repeatedly for the Williamson Crossing so that a reasonably prudent man would be justified in believing that any human being so near these warning sounds would not stay on the track. This is a weaker case than the Voorhees case, where there was no whistling so close to the scene of the accident and where the engineer never did discover that the object on the track was a man. We therefore hold that plaintiff failed to make a jury case of discovered peril.

The judgment is reversed. *Bradley, C.,* concurs; *Dalton, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.