Elizabeth BROOKS, Administratrix of the Estate of James Brooks, Deceased, Plaintiff-Respondent,

v.

TERMINAL RAILROAD ASSOCIATION, a Corporation, Defendant-Appellant.

No. 29061.

St. Louis Court of Appeals.

Missouri.

March 15, 1955.

Motion for Rehearing or for Transfer to Supreme Court Denied April 15, 1955.

Not to be reported in State Reports.

Warner Fuller, Arnot L. Sheppard, and John P. Montrey, St. Louis, for appellant.

Bahn & Gerhard, St. Louis, for respondent.

SAM C. BLAIR, Special Judge.

The verdict and judgment were for plaintiff-respondent in an action for wrongful death. Defendant-appellant's diesel engine struck and killed plaintiff-respondent's decedent. We shall designate the litigants as they were styled in the trial court.

Invoking the humanitarian doctrine, plaintiff grounded her case on her theory that her decedent was in imminent peril and that defendant's servants failed to exercise ordinary care to discover him and to take timely and available measures thereafter to stop the engine and thereby caused the casualty. Questioned by this appeal are (1) the sufficiency of the evidence to warrant the verdict and judgment on plaintiff's theory, and (2) whether her theory can be applied to the record made.

We must view this record most favorably to her. We must accept her evidence as true, reject all of defendant's conflicting evidence, and allow her the benefit of every favorable and reasonable inference which the totality of the evidence justifies. Savage v. Michalon's Estate, Mo.App., 176 S.W.2d 626; Keyton v. Missouri-Kansas-Texas R. R., Mo.App., 224 S.W.2d 616.

The petition alleges, and the answer admits, that intersecting Hall and Branch Streets in St. Louis are open and public streets. The evidence favorable to plaintiff, and the favorable and reasonable inferences which the whole record warrants, justified a finding of these facts: Branch is completely paved and runs generally east and west. Hall runs generally north and south. They intersect at right angles. Laid longitudinally in Hall are four main line railroad tracks. They are referred to in the record as tracks 1, 2, 3, and 4. Track 4 is on the westernmost side of Hall. Hall is paved on both sides of these tracks. The terrain they occupy is unpaved. It is ballasted with gray chat. At the intersection of Hall and Branch the tracks are straight. From the north line of Branch they continue straight on Hall to and through a slight westwardly curvature, the location of which requires particularized analysis hereafter, and therefrom to a curve of 2° 15′ which is 233 feet north of Branch's north line.

On October 31, 1953, about 8:20 p. m., defendant's diesel engine was pulling 19 cars and a caboose in Hall on track 4 and traveling south toward Branch. The engine crew fixed the rate of movement at 7–10 miles per hour at all relevant times. Their testimony, moreover, was that the engine and cars, moving at that rate, could have been stopped, by setting the emergency air brakes, within 65–69 feet at any time and

with safety. Continuing south the engine approached the curve which was north of Branch.

There was no moon and the night was cloudy and of ordinary darkness. The engine was equipped with a stationary headlight on its south or forward end, adjusted to throw light directly on the track area ahead. It was operating perfectly. It projected a bright or glaring spot of light, hereafter called the spotlight, which struck the track at a distance variously estimated at 100–125–140 feet ahead of the engine. It illuminated all of the area between the rails and also the area on the outside of the rails for as much as two feet beyond the tie ends. On a straight track, according to the engineer, "You could see anything if it was directly in line with your (spot of) light."

The engine was manned by an engineer, fireman, foreman, and headman. The engineer and fireman were in the engine cab. The engineer was on the east side of the cab and the fireman was on its west side. Adequate forward vision was available to both through front and side cab windows. The fireman was looking through his front cab window and the engineer was looking either through his front or side cab window. The foreman was on the east side of a step located on the south or forward end of the engine and the headman was on the west side. The entire crew was looking south down track 4 on Hall toward Branch.

As the engine was coming off the curve, the deceased, for some reason which is unexplained, was lying in Hall Street on the gray chat ballast background, on his back with his face up, between tracks 3 and 4 and beside the east rail of track 4, about 2½ to 5 feet from the north line of Branch. His feet, and his legs just above the ankles, were then lying across the east rail of track 4. He was wearing brown suede shoes, tan trousers, a white shirt, tan jacket, and a brown hat.

Just before the engine came off the curve, the fireman, foreman and headman saw an "object" lying "right alongside of the (east) rail," "about on the edge of the ties and the end of the rail, outside the edge of the rail,"

"below the ball of the rail." To the fireman it looked like "wadded up paper, brown paper" and seemed about 2½ feet long, 1½ feet wide, and 5 inches thick. It was not unusual for the crew to see paper lying in this area. The headman observed it and described it as being about 3 feet long and "like pasteboard lying alongside the rail." The foreman noticed it and described it as resembling "a piece of paper or something." The engineer failed to notice it. The fireman did not thereafter keep the object "steadily in view," although he "glanced at it occasionally." The headman noticed it, "looked over it," and continued looking south toward Branch. The foreman testified, "Well, the headman and I were sitting outside, riding outside, and as we come around the curve that headlight shined around there and we seen a piece of paper or something lying there on the ground between three and four and just looked down the track, down the middle of the track, * * *." He did not look at the "object" again. The crew was looking south toward Branch for vehicles and pedestrians at the intersection. None of the crew who noticed it ever saw it give any sign of movement.

No member of the crew notified the engineer of the presence of what had been seen beside the track. There was no slackening of the movement of the engine. When it reached a point about 8 or 10 feet from the object, the foreman "just happened to look down there about 8 or 10 feet away and then I seen a man lying there." It was deceased. The fireman, foreman, and headman, it seems, discovered the presence of deceased about the same time. The engineer probably discovered him an instant before the others for he had the air set for emergency stop before anyone could give him a signal. The engine was stopped in 65–69 feet. It had struck deceased, dragged him for many feet, and fatally injured him.

■■ The trial mainly revolved around the issue whether the spotlight ever fell on deceased and illuminated his peril. Circumstances forced plaintiff in presenting her case to present the fireman as her witness in undertaking to establish that as a fact. But the fireman and the entire crew main-

tained that, proceeding from north to south, and within 100 feet of Branch, the engine was on a curve which was sufficiently sharp to divert the spotlight to the east and beyond the east rail and its tie ends at the place where the deceased was lying. Plaintiff is not necessarily concluded by the fireman's testimony and certainly not by that of the other crew members. Holland v. St. Louis & S. F. R. Co., 105 Mo.App. 117, 79 S.W. 508; Burton v. Chicago & A. R. Co., 176 Mo.App. 14, 162 S.W. 1064; Maginnis v. Missouri Pac. R. Co., 268 Mo. 667, 187 S.W. 1165. Nor is it necessarily fatal to her case that she was unable to prove by an eye witness that the spotlight actually fell on deceased. The constitutive elements of negligence may be legally supported by circumstantial as well as by direct evidence. Her theory that the spotlight fell on deceased and revealed his peril can be legally supported if the entire record includes circumstances and facts amounting to substantial evidence contradictory of the crew's denials. Elgin v. Kroger Grocery & Baking Co., 357 Mo. 19, 206 S.W.2d 501; Rine v. Chicago & A. R. Co., 100 Mo. 228, 12 S.W. 640.

A plat verified by defendant's civil engineer showed the track as a straight of way from Branch north for 69 feet and therefrom with a curvature of 30' or ½ of 1° to the west for 164 feet to a point 233 feet north of Branch. Therefrom the curvature was portrayed as "compounded" or increased to a curve of 2° and 15' to the west. A plat verified by plaintiff's civil engineer showed the track as a straight of way from Branch to a point 164 feet north and there as entering a curvature to the west "so slight it is hardly apparent on the drawing unless you lay a straight edge on there." Both plats were drawn to scale.

As more favorable to plaintiff we adopt and take as true her evidence that the track was a straight of way north from the north line of Branch for 164 feet, and, since her civil engineer did not state the track's curvature in minutes or degrees for the next 69 feet, we can and do adopt and take as true the defendant's engineer's testimony that the curvature of the next 69 feet to the

point 233 feet north of Branch was no more than 30' or ½ of 1° to the west. Accordingly, substantial evidence justified a finding by the jury that defendant's engine, proceeding on track 4 from north to south toward the north line of Branch, first would leave a curve of 2° and 15' to the east, next it would enter 69 feet of curvature of only 30' or ½ of 1° to the east and then it would strike the absolute straight of way leading 164 feet south to the north line of Branch.

The plats presented by both parties are before us as they were before the jury. Photographs which each party entered as evidence, and which show the track north from the north line of Branch, are before us also. Our study of them convinces us that they strongly corroborate the theories of the track and of its curvatures which we have adopted and taken as true. Furthermore, they are substantial evidence, we think, from which a jury could conclude that the 30' curvature in the 69 feet of track, immediately south of the 2° 15' curve and immediately north of the 164 feet of straight of way, was so very slight that it ought to be disregarded as infinitesimal. We believe also that these plats and photographs are substantial evidence that defendant's southbound engine, as soon as it left the curve located 233 feet north of Branch and was in the 69 feet of curvature, began then to travel south to Branch on a track whose length therefrom to Branch was between 233 and 164 feet and which, for all material purposes, was virtually straight all of the way to Branch and which was absolutely straight for the last 164 feet. It is of no consequence that defendant's witnesses, and the fireman as plaintiff's witness, stood on an entirely different theory of the course of the track. The jury was not required to believe them and was free to conclude that the segment of track in controversy was shown to be straight by the substantial evidence before them. Clark v. Howard, Mo.App., 273 S.W.2d 771; Ford v. Louisville & N. R. Co., 355 Mo. 362, 196 S.W.2d 163.

Just as much was the jury free to disbelieve the unanimous assertion of the crew that the spotlight did not fall on deceased

and illuminate him at any time. The evidence and the reasonable inferences from it support the conclusions which follow. The crew, except the engineer, saw an "object" as the engine was coming off the 2° 15′ curve 233 feet north of Branch. The object was deceased, of course, although he was not recognized as human, and he was lying "right alongside of the (east) rail," "about on the edge of the ties and the end of the rail, outside the edge of the rail," "below the ball of the rail." Photographs before us sustain an estimate that the ends of the ties were extended 1½ feet or slightly more from the outside of each rail. On a straight track the spotlight illuminated the area between the rails and an area outside of each rail to a distance of 2 feet beyond the ends of the ties. Thus it illuminated an area of 3½ feet on the outside of each rail, and this area necessarily would include the place where deceased was lying. The crew could see anything directly in line with this spot of light, for it was bright and glaring and was working perfectly.[1]

■ The crew's assertion that the spotlight could not fall on deceased and illuminate him and their insistence that consequently they could not discover that he was a human being cannot avail defendant. On this record, and on plaintiff's theory, it is altogether irrelevant whether they actually discovered deceased and recognized him as human. Substantial evidence authorized the jury to find that the spotlight did strike

and illuminate him so that he could have been seen and recognized and the crew must be held responsible for what ordinary care would have led them to see. Rodgers v. St. Louis-San Francisco R. Co., Mo.App., 31 S.W.2d 546; Nicholson v. St. Louis-San Francisco R. Co., Mo.App., 51 S.W.2d 217.

Furthermore, there was substantial evidence that the crew failed to exercise ordinary care to discover deceased and his peril. For the engineer failed even to see the "object" beside the rail. The fireman noticed it, "glanced at it occasionally," but mainly "looked straight down the track" and failed to recognize it as a human being. The foreman and the headman noticed it and assumed it was paper or pasteboard. They merely looked beyond it, did not give it a second glance, and "just looked down the track, down the *middle* of the track." All were looking for pedestrians and vehicles on the crossing and the inference is strong that they were paying little or no attention to the track or its environs. Certainly the jury could find that ordinary care required of defendant's servants a greater measure of attentiveness and vigilance than they were then exercising to discover persons on and near the tracks.

■ Substantial evidence already recited justified a finding that the members of the crew, had they discovered deceased when he was illuminated by the spotlight, could have stopped the engine in time to have avoided striking and killing him.[2]

1. Adopting as true the figures and measurements most in plaintiff's favor, the jury could find that the deceased was lying 2½ feet north of Branch or 161½ feet south of the negligible ½° curvature which ended 164 feet north of Branch. The headlight was projecting its spot or glare of light at a point either 100 or 125 feet in advance of the engine. At a point 36½ feet south of the end of the ½° curvature and 127½ feet north of Branch, that is, 125 feet from the place deceased was lying, the track was straight, the engine was all but out of the curvature, and the headlight could not fail to throw its spot on deceased and to illuminate him. That the engine then might not have been altogether out of the ½° curvature could result only in lighting more and not less of the east side of the

track. (Influence of ½° curvature all but vanished. Track was standard gauge, 4¾ feet. Thus spot of light lighted 4¾ feet between rails plus 3½ feet outside each rail, or 11¾ feet. Precisely how much a curvature of less than ½° diverted spotlight east at 100 or 125 feet we do not know, but do know diversion was far less than 11¾ feet, distance required to divert light entirely away from area lighted on straight track.) At 61½ feet south of the end of the ½° curvature and 102½ feet north of Branch, that is, 100 feet from deceased, the track was straight, the engine off all noticeable curvature, and the spotlight could not miss him.

2. We assume ¾ second is sufficient for any member of the crew to react and to

Questions of negligence are for the jury in all instances, unless reasonable minds, on the whole record, could not entertain differences of opinion on the question whether the care that is due has been exercised. Anderson v. Missouri Granite & Construction Co., Mo.Sup., 178 S.W. 737; Parker v. Nelson Grain & Milling Co., 330 Mo. 95, 48 S.W.2d 906; Miller v. Dunham, Mo.App., 186 S.W. 29. Our study of this record convinces us, and we hold, that it affords a substantial basis for differences of opinion between reasonable men arguing the question whether, exercising ordinary care, the crew could have discovered deceased's peril and whether time was available to them after that discovery to stop the engine with the facilities at hand and thereby prevent the tragedy. We rule that plaintiff made her case on her theory.

But defendant argues we should not apply plaintiff's theory, for, lying in the street beside the track, deceased, unreasonably using the street, was a mere trespasser and not entitled to the benefit of the doctrine of discoverable peril which requires a railroad to maintain a lookout for persons lawfully on its tracks. The argument is that defendant owed deceased no duty at all to look out for him and no duty before it might happen to discover him. Since the crew failed to discover him, no duty to stop the engine arose.

Decisions from this state and others are cited as authority for such a ruling. Those from other states need not be analyzed for we believe our own courts have fully answered defendant's argument: One Missouri decision cited, Carpenter v. Kurn, 345 Mo. 877, 136 S.W.2d 997, construes Oklahoma law and is of no relevance. The

others deal with persons sitting or lying on a railroad's private right of way where there was no established user. They are not in point. Railroads are entitled, in those circumstances, to the exclusive use of their private rights of way and may assume that the track there is clear. No obligation rests on them to maintain a lookout to discover persons sitting or lying on their tracks. Their sole duty is to take available measures to safeguard them if they are discovered. Such are the rulings in Voorhees v. Chicago, R. I. & P. R. Co., Mo.App., 7 S.W.2d 740; Id., 325 Mo. 835, 30 S.W.2d 22, 70 A.L.R. 1106; Stroud v. Kurn, Mo.App., 159 S.W.2d 307; Hoops v. Thompson, 357 Mo. 1160, 212 S.W.2d 730. These decisions do not reach the question with which we are dealing. Cochran v. Thompson, 347 Mo. 649, 148 S.W.2d 532, 534, is beside our question for the situs there was a fenced, private right of way, not accessible except by "going over cattle guards, climbing a fence, or opening gates", and the ruling was that there was no substantial evidence of established user imparting notice that persons likely would lie on the track.

Defendant is bound by its judicial admissions, running through the pleadings, the evidence, and its brief in this court, that Hall Street is an open and public street. In a public street, defendant had no right of exclusive use and no right to expect a clear track. The supreme court in Voorhees v. Chicago, R. I. & P. R. Co., supra, 30 S.W.2d 25 [3], applying to the record before it the rule invoked here by defendant, carefully noticed this and pointed up the irrelevance of that rule to the situation we are considering. "A different rule prevails", said the court, "at places upon a railroad track where persons are likely to be, such,

act. Vietmeier v. Voss, Mo.Sup., 246 S.W.2d 785. Granting the engineer ¾ second to set the emergency air brakes, after deceased was illuminated by the spotlight at a distance of 125 feet, the engine, moving 7 m.p.h., would advance only 10¼ feet per second, or 7¾ feet in ¾ second, and no further toward deceased than 117¼ feet from him, and, with the emergency air set at that point, the engine would come to a full stop in 65 feet and 52¼ feet from him. If the spotlight was projected for a distance of

only 100 feet, as estimated by the engineer, similar arithmetic is that the engine could have been brought to a full stop 27¼ feet from deceased. Allowing double reaction time, or ¾ second for a crew member to react and warn the engineer plus ¾ second for him to set the emergency air, a total of 1½ seconds, the engine, with the spot of light projected 125 feet, could have been brought to a full stop 44½ feet from deceased, and, with it projected 100 feet, 19½ feet from him.

606

for example, as public crossings, *tracks laid along public streets,* and tracks where the public has acquired a user of the track and right of way."

■ Defendant argues it was absolved from maintaining a lookout because plaintiff offered "no evidence that the part of the street where deceased was lying was ever used by vehicles or pedestrians." This argument confuses public streets with places not public but where a continued user imparts notice to the railroad that persons are likely to be on or near the track. Where a user is relied on to impart such notice, proof of user must be made. On the other hand, where tracks are laid in a public street, its public character is notice enough to the railroad of the right of members of the public to be on or near the tracks and that they are likely to be there. Proof of user in such an instance would simply be superfluous. The use or extent of use of Hall Street by the public is not the criterion for determining its character as a public street. It is admittedly a public street, and the public right was not diminished by any failure of the public to use it. Marshall v. Springfield, Mo.Sup., 221 S.W. 17. Incidentally, there was no evidence that the public did not use the place in the street where deceased was lying.

■ Early in our jurisprudence it was settled that persons lying or sitting on tracks laid in a public street, and sometimes persons doing so where the locale is not public but is impressed by a user, are not trespassers in any sense that a railroad or street railway is relieved from maintaining a lookout to discover and safeguard them. Such was the ruling in Goff v. St. Louis Transit Co., 199 Mo. 694, 98 S.W. 49, 9 L.R.A.,N.S., 244; Riggs v. Metropolitan St. R. Co., 216 Mo. 304, 115 S.W. 969; Murphy v. Wabash R. Co., 228 Mo. 56, 128 S.W. 481; Titus v. Delano, Mo.Sup., 210 S.W. 44; Griggs v. Kansas City Rys. Co., Mo. Sup., 228 S.W. 508; Alexander v. Missouri Pac. R. Co., Mo.App., 66 S.W.2d 572; Whiteaker v. Missouri Pac. R. Co., Mo. App., 28 S.W.2d 680. In each decision, a streetcar or engine had struck a person sitting or lying on or beside a track in a public street or at a locale impressed by user. In each it was declared that the duty rested on the street railway or railroad to notice that persons might be on the track and in those positions and to maintain an ordinarily careful lookout to discover and safeguard them. The decision in Papamichael v. Wells, Mo.App., 33 S.W.2d 1058, is at variance with these rulings and cannot be followed.

The ruling in Trigg v. Water, Light & Transit Co., 215 Mo. 521, 114 S.W. 972, 20 L.R.A.,N.S., 987, on which defendant places much reliance, is distinguished in Murphy v. Wabash R. Co., supra, 128 S.W. 486. Defendant would distinguish the Murphy case because the occurrence ruled there took place in daylight and not at night. The distinction cannot be accepted. In Riggs v. Metropolitan St. Ry. Co., supra, 115 S.W. 974, the author of the Murphy case, ruling that nightfall does not diminish, but increases, the obligations of ordinary vigilance, declared: "We are unable to agree with defendant's counsel in their insistence that the hour of night was a factor tending to relieve defendant from its duty to look ahead in running its owl car. This, because due care is a care according to time and circumstance. It adjusts itself automatically to the circumstances of a case. What is due care in one case might be negligence in another. While a degree of darkness, whether from the absence of sunlight, or from the presence of shadows cast by columns on the bridge, or from the fact that the curve in the street threw the rays of the headlight away from the locus (all of which elements are present here), may create an inability to see well, yet it does not tend to show an absence of duty to look. If anything, it increases that duty. The gauge of duty and due care rises precisely as the degree of danger rises."

Our review of the record convinces us plaintiff adopted and pursued the correct theory and that the verdict and judgment rest on substantial evidence. The judgment should be affirmed.

It is so ordered.

RUDDY, Acting P. J., concurs.